GALVESTON, HARRISBURG & SAN ANTONIO RAILWAY COMPANY V.
MRS. ORB CURRIE ET AL.

No. 1555.    Decided October 31, 1906.

**1.—Death—Negligence—Intentional Act.**

Under the statutes making railroad companies liable for death caused by the "negligence or carelessness of their servants" (Rev. Stats., art. 3017) an action may be maintained where the act was intentionally done but the mischievous consequences were unintended.    (P. 142.)

**2.—Master and Servant—Master's Business.**

When the servant turns aside, for however short a time, from the prosecution of the master's work, to engage in an affair wholly his own, he ceases to act for the master, and the responsibility for that which he does in pursuing his own business or pleasure is upon him alone.    (Pp. 142–145.)

**3.—Same—Case Stated.**

An engine dispatcher, having charge of the engines and machinery in a railway roundhouse, and handling a hose conveying a blast of compressed air, provided to work certain machinery, but which, as an experiment, he was using instead of a water hose to extinguish fire in an engine, turned the air blast in sport, and without intending injury, upon the person of an engine wiper, his subordinate in the roundhouse, inflicting injuries which caused his death.    Held, that in such act he was not engaged in the employer's service, and that the railway company was not liable.    (Pp. 140–150.)

**4.—Same—Cases ·Distinguished.**

The present case, of a servant using the machinery of the master under his control for his own sport, and not to promote the master's service, distinguished from acts done in the performance of the servant's duty to the master, but merely accompanied by a motive of malice or of sport in the servant, such as frightening animals by locomotive whistles; also from those of neglect of the servant in the control of dangerous agencies intrusted by the master to his care, which are distinguished from his employment of such agencies wholly for his own purposes.    (Pp. 145–150.)

Error to the Court of Civil Appeals for the Fourth District, in an appeal from Bexar County.

Mrs. Currie and others sued the railway company for the death of her husband.    Plaintiffs had judgment.    Defendant appealed, and on affirmance obtained writ of error.

*Baker, Botts, Parker & Garwood, Newton & Ward* and *W. B. Teagarden,* for plaintiff in error.—The act having been willfully and intentionally done, the same does not fall within the scope and meaning of the words "negligence or carelessness," employed in the statute art. 3017, Rev. Stats., giving a cause of action for damages resulting in death when caused by the negligence and carelessness of the servants or agents of the master.    Art. 3017, Rev. Stats.; Whittaker's Smith on Neg. (2d ed.), p. 3, sec. 3, note E; Sherman & R. on Neg. (2d ed.), sec. 2, note 2; 1 Sherman & R. on Law of Neg. (5th ed.), sec. 7; Croft v. Smith, 51 S. W. Rep., 1089; Houston & T. C. R. R. Co. v. Lipscomb, 62 S. W. Rep., 955; Lipscomb v. Houston & T. C. R. R. Co., 64 S. W. Rep., 926; Mexican Cent. R. R. Co. v. Crum, 6 Texas Civ. App., 707; Galveston City Ry. Co. v. Hewitt, 67 Texas, 478; Hendrick v. Walton, 69

Texas, 196; Missouri K. & T. Ry. Co. of Texas v. Freeman, 79 S. W. Rep., 9; Evers v. Krouse, 66 L. R. A., 594.

The evidence shows an independent act of Nichols, outside of and beyond the scope of his authority and employment, and in no wise connected with any duty being performed by said Nichols for appellant or in furtherance of its business or interests; and further shows that said act was so done by said Nichols for the purpose of playing a prank upon said Currie. This appellant was not responsible in law by reason thereof for the said acts of the said Nichols, and the court erred by reason thereof in refusing to give appellant's charge peremptorily instructing the jury to return a verdict in favor of appellant. International & G. N. Ry. Co. v. Cooper, 88 Texas, 608; International & G. N. Ry. v. Anderson, 82 Texas, 520; International & G. N. Ry. Co. v. Yarbrough, 39 S. W. Rep., 1096; Branch v. International & G. N. Ry. Co., 92 Texas, 289; Burnett v. Oechsner, 92 Texas, 589; Lytle v. Crescent N. & H. Co., 66 S. W. Rep., 240; Lipscomb v. Houston & T. C. Ry., 95 Texas, 19; McManus v. Crickett, 1 East., 67; Croft v. Alison, 4 Barn. & Ald., 590; Evers v. Krouse, 66 L. R. A., 593; Little M. Ry. Co. v. Wetmore, 19 O. St., 111; Rounds v. Delaware & L. W. R. R. Co., 64 N. Y., 129; Cohen v. Dry Dock E. B. & B. R. R. Co., 69 N. Y., 171; Bowler v. O'Connell, 27 L. R. A., 176; Ritchie v. Walker, 27 L. R. A., 161; Baltimore Con. R. Co. v. Pierce, 45 L. R. A., 530; Stephenson v. Southern Pac. Co., 27 Am. St., 223, 93 Cal., 558; McGilvay v. West End St. Ry. Co., 164 Mass., 122; Morier v. St. Paul M. Ry. Co., 31 Minn., 351; Golden v. Newbrand, 52 Ia., 59; Kincade v. Chicago, M. & St. P. Ry. Co., 78 N. W. Rep., 698; Cobbs v. Columbia & G. Ry. Co., 15 S. E. Rep., 878; Chicago City Ry. Co. v. Mogk, 44 Ill. App, 17; Candiff v. Louisville, N. O. & T. R. Co., 42 La. An., 477; Kincade v. Chicago, M. & St. P. Ry. Co., 14 Am. & Eng. R. R. Cases (N. S.), p. 559, see copious notes at the end of the decision; Chaddock v. Plummer, 14 L. R. A., 675.

*Nat B. Jones* and *Carlos Bee,* for defendants in error.—Defendants in error confidently assert that the evidence shows, or there is some evidence tending to show:

I.   That the vice principal, Nichols, had the compressed air turned on and in discharge in the course of his employment and duty to the plaintiff in error:   (a) To use it for an authorized use, (b) For the purpose of protecting plaintiff in error's property.

II.   That this force and destructive agency, so set in motion in the line of his duty and for the master's purposes was thus turned on and in destructive discharge in the very environment and area where deceased was at the time in the course of his employment.

III.   That as the vice principal, Nichols, held it thus in discharge, he partially swung the hose around, or wheeled with it, and struck Currie in or near the rectum.

IV.   That the wheeling and striking Currie with said air occurred immediately after the air was turned on into the hose, and was a part of the res gestae of having it turned on.

V.   That at the time Nichols struck said Currie with the said compressed air he expected the reoccurrence of a fire in the fire box of an

engine just in front of him and had the air turned on as a part of his method of preparedness to prevent the reoccurrence of said fire which was momentarily expected.

Whenever a duty rests on the master to avoid doing harm to third persons and the servant violates that duty while about the master's business, the master will be liable although the wrongful act was not done as a means or for the purpose of forwarding the master's business, but was the result of the servant's malice, capriciousness, mischief or other private purpose. Palos Coal & Coke Co. v. Benson, 39 So. Rep., 727; Pollock on Torts (7th ed.), 73; Meachem on Agency, sec. 741; 1 Jaggard on Torts, sec. 86; Croaker v. Chicago & N. W. Ry. Co., 17 Am. Rep., 507; Hayne v. Union St. Ry. Co., 76 N. E. Rep., 219.

An innkeeper is liable where one of his porters in jest pointed and snapped his pistol at a boy guest whereby it was accidentally discharged, destroying the boy's sight in one eye (Clancey v. Barker, 103 N. W., 446); so, where a saloon owner's barkeeper knew or could have known that a cook from an adjoining restaurant came into the saloon and poured alcohol on the foot of a sleeping lounger and ignited same, whereby the victim of this practical joke was severely burned (Curran v. Olson, 88 Minn., 307; 60 L. R. A., 733); so, where a saloon owner's barkeeper, out of malice, drugged a drink he sold over the bar (Tway v. Salvin, 95 N. Y. Supp., 653); so, where a dairyman's delivery boy adulterated the milk out of malice towards. his master (Stranahan B. Co. v. Coit, 55 Ohio St., 398); so, where a lady customer in a dry goods store lost an eye by a cash boy "snapping pins in mischief (Swinarton v. Le Boutillier, 28 N. Y. Supp., 53); so, where a clerk in a store kicked a lady customer into the street (Collins v. Butler, 81 N. Y. Supp., 1074); so, where ticket agent killed one who was negotiating. for the purchase of a ticket (Columbus & R. Ry. v. Christian, 25 S. E., 411); so, where agent of the express company, immediately after refunding some express money claimed, abused and maltreated the claimant (Richburger v. American Exp. Co., 73 Miss., 161); so, where expassenger called for his baggage and was. shot by the depot agent on account of the former's abusive language to him (Daniel v. Petersburg Ry., 117 N. C., 592).

When an article is imminently dangerous to human life, health or limb, the maker or vendor who sells and puts it forth is liable in tort to third persons, not in privity, who use or come in contact with it and are injured.

Things dangerous within the rule: belladona sold for dandelion, purchaser from subvendee allowed to recover (Thomas v. Winchester, 6 N. Y., 397); saltpetre sold for epsom salts and third party injured (Peters v. Jackson, 57 L. R. A., 428); catering sickening victuals (Bishop v. Weber, 139 Mass., 411); spoiled meat eaten by buyer's guest (Craft v. Parker, 96 Mich., 245); hair injured by harmful hair wash (George v. Skivington, L. R. 5 Exch., Cas. 1); dangerous scaffolding (Coughtry v. Globe W. Co., 56 N. Y., 124; Delvin v. Smith, 89 N. Y., 470); purchaser from subvendee of a kerosene oil that did not come to grade (Hourigan v. Nowell, 110 Mass., 470); purchaser from subvendee of bad kerosene exploding lamp (Elkins v. McKean, 79 Pa. St., 493); patent medicine label prescribed overdose which injured purchaser from

subvendee (Blood Balm Co. v. Cooper, 83 Ga., 457) ; cracked wheel of elevator, negligently repaired by independent contractor, fell on employe in building (Kahner v. Otis Elevator Co., 16 Am. Neg. Rep., 533) ; defective staging erected for owner by defendant fell, employe of another company injured thereby, may recover (Bright v. Barnett & R. Co., 88 Wis., 299) ; builders of bridge are liable where bridge, on account inherent defects, fell and injured one of the public although it had been accepted by the county commissioners (Casey v. Hoover, 89 S. W. Rep., 330).

If the one who sells or puts forth such articles into the world knows of the danger, or would know it by the exercise of ordinary care, then he is liable to a third party not in privity, although the danger is not extraordinary or imminent. Guest of purchaser injured by defective folding bed (Louis v. Terry, 111 Cal. 39) ; diseased hogs placed by purchaser from subvendee with his own (Skinn v. Reutter, 97 N. W., 152) ; where seller of oats knew they had been exposed to infection by Paris Green, which injured subvendee's horse (Provost v. Cook, 15 Am. Neg. R., 78) ; where employe of contractor fell from defective ladder bought by his employer from vendee or maker (Schubert v. J. R. Clark Co., 49 Minn., 331).

This head embraces all those cases where the master sends his dangerous agency or force into the world in the custody of the servant to be used in the master's business. 1 Jaggard on Torts, sec. 88.

Inherently dangerous agencies, that is, where the agency is a source of danger in and of itself, however carefully handled or used. Pittsburg, C. C. & St. L. Ry. Co. v. Shields, 47 Ohio St., 387; Euting v. Chicago & N. W. Ry. Co., 116 Wis., 13; Merschel v. Louisville & N. Ry. Co., 85 S. W. Rep., 710; Mattson v. Minnesota & N. W. Ry. Co., 104 N. W. Rep., 443; Dixon v. Bell, 5 M. & S., 198; Sullivan v. Louisville & N. Ry. Co., 74 S. W. Rep., 171; Smith v. New York Cent. Ry. Co., 29 N. Y. Supp., 540.

Agencies dangerous when proper precautions are not observed in their use. Barmore v. Vicksburg, S. & P. Ry., 38 So., 210; Jaggard on Torts, secs. 84, 85.

"Whenever a master sends his servant out beyond his own eye and immediate control, in the custody of any species of property of the master, which, unless properly cared for, guarded and used, is liable to work injury to third persons, it is necessarily a part of the duty which the master commits to the servant so to care for, guard and use such property that it shall not work such injury." 1 Thompson Neg., sec. 589; Barmore v. Vicksburg, S. & P. Ry., 38 So., 210-214; 1 Clark & Skyles, Agency, sec. 496; 1 Shearman & Redfield's Negligence, sec. 154; Jaggard on Torts, sec. 88; Burdick on Torts, 156; Houston, C. A. & N. Ry. Co. v. Bolling, 27 L. R. A., 199; McClung v. Dearborn, 134 Pa. St., 406; Wallace v. Merimac R. & N. Ex. Co., 134 Mass., 95; Duggane v. Watson, 15 Ark., 118; Nashville & Chat. v. Starnes, 9 Heisk. (Tenn.), 52; Newson v. Georgia Ry., 66 Ga., 492; Brendle v. Spencer, 125 N. C., 475; Cobb v. Columbia Ry. Co., 37 S. C., 194; Culp v. Atchison Ry. Co., 17 Kan., 475; Skipper v. Clifton Mfg. Co., 58 S. C., 143; Indianapolis U. Ry. Co. v. Boettcher, 131 Ind., 82; Bilman v. Indianapolis Ry., 76 Ind., 166; Chicago, B. & Q. Ry. Co. v. Dickson, 63 Ill.,

151; Toledo, W. & W. Ry. Co. v. Harmon, 47 Ill., 299, 95 Am. Dec., 487; Alsever v. Minneapolis & St. P. Ry. Co., 56 L. R. A., 748; Missouri, K. & T. Ry. Co. v. Williams, 91 Texas, 255; Texas & N. O. Ry. Co. v. Syfan, 91 Texas, 562; Gulf, C. & S. F. Ry. Co. v. Box, 81 Texas, 670; Texas & P. Ry. Co. v. Hamilton, 66 S. W. Rep., 797; Hargis v. St. Louis, A. & T. Ry. Co., 75 Texas, 19.

If this duty of the master to maintain the situation in a reasonably safe condition is a continuous one, and the vice-principal is the master's arm as to that duty or service, how can his breach of it be viewed other than as the master's breach of it? 21 Am. & Eng. Ency. of Law (2d ed.), 457; 2d Am. & Eng. Enc. of Law (2d ed.), 443; Wabash Ry. Co. v. Kingsley, 177 Ill., 558; Belt Ry. Co. v. Banicke, 102 Ill. App., 642; Pennsylvania Co. v. Sinclair, 62 Ind., 301, 30 Am. Rep., 185; Peoria Bridge Co. v. Loomis, 20 Ill., 235-251; East St. Louis Ry. Co. v. Jenks, 54 Ill. App., 91-94; Chicago & Grand Trunk Co. v. McDonough, 112 Ill. App., 315; Proctor v. Southern Ry. Co. (S. Car.), 42 S. E. Rep., 427; Wabash Ry. Co. v. Speer, 156 Ill., 244; Chicago B. & Q. Ry. Co. v. Diebson, 88 Ill., 431; Girard Coal Co. v. Wiggins, 52 Ill. App., 69-82; Chicago B. & Q. Ry. Co. v. Johnson, 103 Ill., 512; Chicago City Ry. Co. v. Jordan, 215 Ill., 397; Chicago R. I. & P. Co. v. Hamler, 215 Ill., 525-540.

WILLIAMS, ASSOCIATE JUSTICE.—This writ of error brings before us a judgment of the Court of Civil Appeals of the Fourth District affirming a judgment of one of the District Courts of Bexar County against plaintiff in error and in favor of defendants in error, the widow and children of J. B. Currie, for damages resulting to them from his death charged to have been caused by the negligence of the plaintiff in error.

The facts out of which the questions arise may be stated thus: The act which caused Currie's death and for which the railroad company is charged with responsibility was committed by one Nicholls who was employed by it as one of its engine dispatchers in its roundhouse in San Antonio and had under his direction and control a number of subordinates among whom were Currie, who was an engine wiper, and one Spahn, who was a hostler. Nicholls, when on duty, had "the care, custody and control of things used there (in the roundhouse) for the purpose of getting engines in and out" and his duties required him to have all necessary work done on engines, to receive them when they came in, to get them ready and dispatch them out when wanted for use on the road. His testimony admits of the construction that his duties were such as to include the right, when he thought proper to do so in their performance, to use the compressed air with which the roundhouse was supplied, as stated below. And it was the duty of himself or of any of the employes to put out a fire on an engine when they saw it. Currie's duties were to clean engines and to do whatever else in the roundhouse he might be ordered to do. By means of a main pipe of iron passing through it overhead, the roundhouse was supplied with compressed air passing through the pipe from a storage tank, and from this main pipe there led downward into each engine stall a smaller pipe also of iron, to which a rubber hose one-half inch in diameter, could be

screwed for the purpose of using the air as a motive power, its pressure ranging from forty to one hundred pounds to the square inch. Each of these smaller pipes had upon it a globe valve by which the amount of air turned into the hose could be regulated. "Cracking" the valve, as used by the employes, meant the turning of it partially on. This compressed air was used, as shown by the testimony, as a motive power for loading wheels or heavy machinery, for running gear motors, for drilling and rivetting, for cleaning flues, by boiler makers and machinists in the performance of their various duties and in any other way when it could serve a proper purpose. On the occasion when Currie received the injury from which he died, Spahn, the hostler, had brought into the roundhouse an engine, with an oil burner, in the ash pan of which oil was burning. Up to this time water had been used to extinguish fires in the engine, but no water hose being at hand, Spahn, for the first time and as an experiment, determined to use the compressed air to blow the fire from the ash pan, and, having attached a hose to one of the pipes, requested Currie, who was standing by, to turn the valve. He succeeded in thus blowing out the flame, but the loud noise thus made attracted Nicholls and other employes to the spot. The fire was then out and Currie had shut off the air, but Nicholls, apprehending that the valve confining the oil in the engine might not be properly set and that escaping oil, running over the hot surface, might reignite, directed Spahn to go upon the engine and see to the condition of the valve, taking from Spahn the hose which was still attached to the air pipe, and directed Currie to "crack" or turn on the air. Some statements in the record, which counsel for defendants in error regard as presenting the aspect of the facts most favorable to them, are to the effect that Nicholls thus held the hose charged with air to be ready to blow out any fire that might spring up in the engine. This will be assumed to be true for the purposes of our decision. As Spahn ascended the engine Nicholls turned the hose so as to strike him with the escaping air, causing him to jump and the bystanders to laugh. He then, almost immediately, according to some of the evidence, turned the hose upon Currie so that the air struck him about the buttocks. That this was done in sport as a practical joke is conclusively shown by the evidence. No ill effects were at once noticed, but after a few moments Currie became sick and complained that he was hurt, and upon subsequent medical examination and an operation it was demonstrated that the air had entered through the clothing into the rectum, perforated and lacerated the intestines in many places and escaped into the abdominal cavity outside of the bowels, eventually causing death. The physician who testified to these facts stated that neither he nor any of the other doctors with whom he talked about the case believed that such a thing could be possible until the unquestioned facts proved it, and that it was the most remarkable accident of which he had ever heard.

The charge of the trial court submitted the cause to the jury under the ordinary rule by which a master is made responsible for acts of his servant done in the line of his duty and in the scope of his employment. The verdict necessarily affirmed that the act of Nicholls was of the character to make the railroad company liable under that rule and the Court of Civil Appeals, in affirming the judgment, held that the evidence war-

ranted such a finding. This presents one of the principal questions now to be decided.

Beyond this, counsel for defendants in error contend that liability of the railroad company is established under a principle laid down in the authorities which, in effect, declares that one who keeps in his possession or employs in his business that which, unless carefully guarded and used, is dangerous to others, is bound to exercise proper care to see that it is so kept and used as not to inflict injury; and the negligence of anyone into whose care it is committed by the owner, either in failing to properly guard it or in improperly using it, is that of the owner; and it is claimed that this is true where the servant or custodian, as in this case, employs the dangerous thing, not in the line of his duty or for any purpose of serving the master, but for his own purposes, the contention being that this is a violation of the duty of the servant to safely keep it.

Another question, the consideration of which naturally comes first in order, is made by counsel for plaintiff in error by the contention that an action is not given by the statute of this state for a death caused as that of Currie was. The statute gives such action against railroad companies when the death is caused by the "unfitness, negligence or carelessness of their servants or agents." There is no pretence that this death was caused by unfitness of Nicholls, and the proposition is that it did not result from his negligence or carelessness, but from his willful and intentional act. The meaning of this statute was to some extent considered in Railway v. Lipscomb, 95 Texas, 5, in which a much more plausible contention on the part of the defense was overruled. In that case the employes of the defendant intended to kill the person at whom they shot, but negligently executed the master's orders in mistaking the person slain for a burglar. Here the servant intended not to kill, but only to play a harmless prank, and, in the effort to do so, mistakenly employed means which caused death. If it be true that the statute requires that the death be negligently, as distinguished from willfully, caused, it does not follow that the *act* from which the death results must be unintentionally done. Thus restricted, the statute only requires that the *death* be caused by negligence, and it seems plain that, if the servant intentionally does an act with no purpose of inflicting injury, but so does it as proximately to cause death, the result is due to his negligence or carelessness. Indeed, in a large proportion of the injuries resulting from negligence, an act is intentionally but negligently done, while its mischievous consequence is unintended. We therefore hold that there is nothing in this contention.

But we can not agree that the evidence, regarded in its strongest light for plaintiffs, warrants the conclusion that Nicholls' act was done in the prosecution or furtherance of his employer's business. The case is controlled, in our opinion, by the proposition, in which all authority agrees, that when the servant turns aside, for however short a time, from the prosecution of the master's work to engage in an affair wholly his own, he ceases to act for the master and the responsibility for that which he does in pursuing his own business or pleasure is upon him alone. Let it be conceded that in holding the hose in readiness to put out any fire that might again flare up Nicholls was performing a duty as servant, and that had he, while thus holding it, or in attempting to use it for

the purpose for which it was held, negligently turned it against one of the other employes, his negligence would have been imputable to his employer as incidental to the effort to do that which was in the line of the servant's duty. It may be further conceded that, if in directing the hose at a fire to put it out, he had also struck with it one of the other servants, either to make him get out of the way or for some other purpose, the motive thus partly influencing his act towards such other would not deprive it of its legal character as done in the master's business. It is in cases of the character supposed, where there has been a mingling or personal motive or purpose of the servant with the doing of his work for his employer, that much of the difficulty and conflict of opinion have arisen in determining whether or not the wrong committed should be ascribed to the master, or be regarded as the personal tort of the servant alone. It is now settled, in this state at least, that the presence of such a motive or purpose in the servant's mind does not affect the master's liability where that which the servant does is in the line of his duty and in the prosecution of the master's work. But when he goes entirely aside from his work and engages in the doing of an act not in furtherance of the master's business but to accomplish some purpose of his own, there is no principle which charges the master with responsibility for such action. These principles were accurately stated in the charge of the trial court, but the error was in assuming that the facts presented any basis for a recovery under them. The fact that Nicholls, while holding the hose, conceived the purpose of using it and did use it upon the employes, in sport, is undisputed and is wholly inconsistent with any assumption that he was then in any way attempting to serve the defendant. His act was a clear departure, for the time, from that service, and the quickness with which it was done can not be made the test. If the turning aside from the master's business be only for an instant, so that it be complete, the authorities agree that there is no liability on his part for the servant's act. (1 Thomp. on Neg., 526, and cases cited.) If a miner, or butcher stand with pick or knife raised, to dig or to stab an animal, for the master, and, seeing his enemy before him, turn the tool upon him as a weapon to kill him, would any one argue that the master should be held accountable for the death? Where is the difference if the instrument be used merely to frighten for the amusement of the servant? The only difference between such cases and other personal wrongs committed by persons who happen to be employes of other persons is the fact that in the cases supposed the servants misuse the implements entrusted to them by their masters. But that, certainly, is no reason for charging the master, as cases almost numberless will show. International & G. N. Ry. Co. v. Cooper, 88 Texas, 610; Little Miami Ry. v. Wetmore, 19 Ohio St., 110; Golden v. Newbrand, 52 Ia., 59; Howe v. Newmarsh, 12 Allen, 49.

In the old English case of Croft v. Alison (4 Barn and Ald., 590), the distinction between an act of a servant done in his master's interest and one done wholly for himself while at the same time serving the master is sharply drawn. The court thus stated the doctrine: "If a servant driving a carriage, in order to effect some purpose of his

own, wantonly strike the horses of another person and produce the accident, the master will not be liable. But if, in order to perform the master's orders, he strikes, but injudiciously and in order to extricate himself from a difficulty . . . the master will be liable, being an act done in pursuance of the servant's employment." In the case last supposed the result would be the same although the act of the servant was also malicious. Two other cases which may be referred to as apt illustrations are. Hankinson v. Lynn Gas and Electric Co., 175 Mass., 272, and Evers v. Krouse, 58 Atl. (N. J.), 181. In the Massachusetts case a servant of the defendant, who had ascended a pole for the purpose of replacing burned carbons in the lamps with new ones, struck the plaintiff, who was driving along the street, in the eye with one of the rejected carbons. Some of the evidence tended to show that this was done in the course of the servant's duty in merely throwing the carbon to the ground, while other evidence was to the effect that, in order to attract plaintiff's attention so as to speak to him for purposes of his own, the servant threw the missile at plaintiff's team. The court held that the liability of the master depended on the question of fact thus raised and that this was properly submitted to the jury by a charge which instructed that the defendant would be liable if the carbon was thrown "for the purpose of carrying out and performing his (the servant's) duty in his employment," but would not be liable if the carbon was thrown "to carry out some whim of his (the servant's) own, in accordance with some impulse of his own, and not for the purpose of carrying out or accomplishing the purposes for which he was then and there employed."

In the Evers case, the defendant's son, treated as his servant, while engaged in sprinkling defendant's lawn with water by means of a hose, turned the water upon plaintiff's horse causing it to run away. The liability was made to depend on the question of fact, whether or not the boy threw the water on the horse in the work of sprinkling or departed from that and did the act mischievously and for his own amusement. The court thus clearly expressed the true doctrine: "An act done by the servant while engaged in the work of his master may be entirely disconnected therefrom—done, not as a means or for the purpose of performing that work, but solely for the accomplishment of the independent, malicious or mischievous purpose of the servant. Such an act is not, as a matter of fact, the act of the master, in any sense, and should not be deemed to be so as a matter of law. As to it the relation of master and servant does not exist between the parties, and for the injury resulting to a third person from it the servant alone should be held responsible. Aycrigg's Exrs. v. New York & Erie R. R. Co., 30 N. J. Law, 460; Rounds v. Delaware, L. & W. R. R. Co., 64 N. Y., 129, 21 Am. Rep., 597; Bowler v. O'Connell, 162 Mass., 319, 38 N. E., 498, 27 L. R. A., 173, 44 Am. St. Rep., 359."

Exactly this distinction was made by this court in the cases of Houston & T, C. Ry. Co. v. Bell, 97 Texas, 73; Denison & S. Ry. Co. v. Carter, 98 Texas, 196; Branch v. International & G. N. R. R. Co., 92 Texas, 288; Dawkins v. Gulf, C. & S. F. Ry. Co., 77 Texas, 229; International & G. N. R. R. Co. v. Cooper, 88 Texas, 607. In the last

cited case the engineer and fireman, intending to play a practical joke on plaintiff, by injecting cold water into his pocket through a hose, by mistake turned on hot water and steam. The gist of the decision is expressed in these sentences: "In this case, the fireman and engineer were, at the time the injury was inflicted, in the employ of Campbell, receiver, and were engaged in the performance of a service to him; that is, they were operating a locomotive, each performing his duty as engineer and fireman. The injury, however, did not occur from anything done in the performance of such duty, but by the independent act of the servants, in no wise connected with the duties thus being performed. It is true that circumstances might have required the discharge of hot water from the boiler by means of the appliances used in this instance, but upon this occasion the evidence shows that the act done was not for the purpose of discharging a duty, but simply as one of sport and mischief on their part towards the injured party." In that case the time consumed in the departure of the servants from the master's service was probably longer than in this, but that can make no difference in the principle, the fact of departure being clear and distinct.

The many cases in which railroad companies have been held liable for the consequences of the acts of the servants in so using in malice or sport the whistle, the steam, or other parts of locomotive engines, or the engines themselves, under their control, as to frighten animals or people have been placed either on the ground that the acts were in the performance of duty to the employer, the purpose of the employe merely accompanying it, or upon the doctrine which we will presently discuss as to the liability of the master for the conduct of his servants in keeping and using extra dangerous instrumentalities and agencies committed into the charge of the servants. These authorities do not at all dispute the principle applicable when the servant in the discharge of his ordinary duties steps aside therefrom to accomplish some end wholly his own and, in doing so, inflicts injury. Counsel for defendants in error, however, argue, as indicated at the beginning of this opinion, that there is an enlargement of the liability of the master for the acts of the servant when the latter is entrusted with the custody and control of highly dangerous agencies employed in the business of the master, by which the master is made responsible, not only for acts and omissions of the servant in the course of his employment, but for any misuse of such agency for his own purposes and not in the execution of any duty to the master. Since no question as to the existence of facts which may be necessary to establish such a liability was submitted to the jury, everything essential to its existence would have to be admitted or conclusively established by the evidence before we could affirm the judgment on that theory. The doctrine relied on is thus stated by Judge Thompson: "Every person who employs highly dangerous agencies upon his premises or about his business stands under the obligation of exercising, to the end that third persons shall not be injured through those agencies, a degree of care proportionate to the danger of such injury. This has been characterized as a very high degree of care, and in some cases,

according to one view, the person employing the agency is liable as an insurer. If a person employing such an agency commits the custody of it to his servant, he thereby commits to the servant the obligation to discharge his own duty of caring for it so that it will not injure third persons. If, while so charged with this duty, the servant negligently abandons the custody of it, so that a third person is injured in consequence of this negligence, the master will be liable; and it will make no difference at all with his liability, whether, in so abandoning the duty, the servant did so for the purpose of effecting some purpose of his own, or in furtherance of the business of his master. In either case the master committed to the servant the discharge of a duty which the law has imposed upon the master for the safety of third persons, and the servant has abandoned that duty; and this is enough to render the master liable, without any regard to the motive of the servant. This may be illustrated by the case where a railway company furnished its servants with dynamite cartridges to be placed upon the track for the purpose of alarming trains approaching other trains in times of fog, darkness, storm, etc., in which the ordinary signals can not be seen. The servants of the company playfully placed some of them on the track, in order to frighten some ladies with whom they were acquainted, and one of them was left there, and was picked up by a child, who carried it some distance, and then caused it to explode, injuring another child. It was held that the railway company was liable to pay damages, The railway company was under the duty of keeping the dangerous agents carefully guarded; it committed this duty to its servants. It was not merely their duty to use them, but also to guard them, and for the failure of this duty the master was liable, on the footing of its being negligence within the scope of the employment of the servants." (1 Thompson on Neg., sec. 523.) Again, in section 532, the same author says: "So, a master who employs dangerous agencies upon his premises, or in the prosecution of his business, and commits such agencies to his servants, thereby commits to them his own obligation of using care in respect to them to the end that third persons be not injured by them, and he is responsible for the negligence of his servants in discharging this obligation, although they may have been guilty of the act of negligence for the sole purpose of accomplishing some object of their own outside the scope of their employment." This seems to be an accurate summing up of the cases cited by counsel for plaintiff, and to be as strong a statement as sound principle will allow.

In the application of the law thus laid down, these questions arise: 1. Is the compressed air introduced by the defendant into its round house shown to have been so dangerous that a person of ordinary prudence so using it would have adopted special precautions for guarding it to prevent injury to others. 2. Were the arrangements made by the defendant for keeping it such as would have been employed, as sufficient, by such a person, considering its character and the danger likely to result from its presence and use. 3. If not, did the death of Currie result from the want of such care on the part of defendant, or of its servants into whose custody the agency was committed, which includes the further question, whether or not Nicholls' act, in diverting

the air from any use to which he was authorized to put it for the defendant and converting it into a plaything, is to be imputed to the defendant as a failure to perform its duty to properly guard it.

To fix liability on the defendant all of these questions must be determined in favor of plaintiffs. As to the first, it seems to be assumed that the question, whether or not the thing used is of so dangerous a nature as to impose the special duty of guarding it, is one of law to be decided by the court. But this is obviously not true as a general proposition. In the absence of some positive law forbidding or regulating the keeping or use of the thing, the fundamental question is one of negligence *vel non,* depending, as in other cases of negligence, upon the inquiry whether or not there has been a neglect or violation of the duty which the law imposes upon all persons to use due care in the use of their property or the conduct of their business to avoid injury to others. Some of the older cases in England seem to assert the absolute liability of an insurer, but it is settled in this state that the question is one of negligence (Gulf, C. & S. F. Ry. Co. v. Oakes, 94 Texas, 155) ; and this becomes a question of law only, as it becomes such a question in other cases, when the facts are undisputed and allow but one reasonable conclusion. Obviously the same reflections apply to the second question stated. It is by no means clear that the evidence was sufficient to have authorized a finding in favor of the plaintiffs on those questions (the first and second), but it is clear that it would not justify this court in holding that the necessary facts are conclusively established. Further elaboration upon these propositions is unnecessary because we are of the opinion that the answer to the third question is conclusive against the plaintiffs. We can not agree to the proposition, to which this contention would come, that, because an instrumentality may become dangerous to others, its owner, when he commits it to his servant to me employed in his business, makes himself responsible for everything the servant may do with it. His responsibility is for the management of his business by the servant and not for injuries done by the servant's independent conduct of his own affairs. In such matters, it may be granted that the exercise of proper care for the safekeeping of the dangerous thing is the duty of the master and that the omission of that care by the servant is, in law, the omission of the master. But when the servant employs the thing, not in the master's service, but wholly as an instrument of malice or amusement, he takes himself for the time out of the employment. It is true that when using such an instrument for his own purposes to injure or frighten others or to amuse himself the servant is not keeping it safely; but it is true also that in the act he does he is not representing the master, and the injury he inflicts is the result of that act and not of a mere failure to properly keep. As was said in International & G. N. Ry. Co. v. Cooper, 88 Texas, 609: "The dangerous character of the machinery does not affect the question, because the injury did not result from the dangers connected with the operation of the machinery." The distinction is not technical, merely, but is made necessary by the reason upon which the rule *respondeat superior* rests.

For reasons of public policy the law holds the master responsible for

what the servant does, or omits, in conducting the master's business, because the master has voluntarily substituted for his personal management and supervision that of the servant. But the law also recognizes that the servant is still an independent and responsible being, with capacity, which the master can not control, to engage in projects of his own, and does not include in the responsibility laid upon the master liability for those acts of the servant which are but the exercise of his freedom about his own affairs. The fact that the servant, in pursuing his own business or pleasure, neglects also to perform some duty which rests upon the master may make the master responsible if injury fall upon another as the consequence of that neglect; but that is a very different proposition from that maintained by plaintiffs, asserting liability for an injury resulting, not from the mere neglect, but from the positive personal wrong of the servant. This may be illustrated by reference to the leading case in this country upon the subject, which is stated in the section above quoted from Thompson on Negligence. (Pittsburg, etc., Ry. Co. v. Shields, 47 Ohio St., 387.) The injury there was not inflicted by the servant in the attempt to play a joke, but resulted from his negligence in leaving the cartridge where the children found it; in other words, from his failure to safely keep it. The question we are discussing would have arisen if the servant, in the effort to injure or frighten, and not in the performance of any duty, had caused damage by exploding the cartridge. A liability might have arisen also, if the car, in passing over the cartridge, had exploded it and injured some person, because the injury would have resulted from the movement of the defendant's car over its track in the doing of its business, and it is upon this ground we think the judgment in Euting v. Chicago & N. W. Ry. Co., 116 Wis., 13, may be sustained. The doctrine, or at least some of the reasoning, in the Shields case has been criticised by other courts (Obertoni v. Boston & M. Ry., 71 N. E. Rep., 980; Sullivan v. Louisville & N. Ry., 74 S. W. Rep., 171), and there are some broad statements of doctrine in that as well as in the Euting case and in others following them which, if separated from the facts in the minds of the courts, would tend to sustain plaintiff's contention; but the conclusions reached upon the facts in those cases do not seem to conflict with the views we express. Among the other decisions most relied on as applying the doctrines of those cases are Harriman v. Pittsburg, C. & St. L. Ry., 45 Ohio St., 11; Alsever v. Minneapolis & St. L. Ry., 56 L. R. A. (Ia.), 478; Merschel v. Louisville & N. Ry., 85 S. W. Rep. (Ky.), 710; Barmore v. Vicksburg, S. & P. Ry., 38 So. Rep., 210; Mattson v. Minnesota & N. W. Ry., 104 N. W. Rep., 443.

It may be just to charge a master with liability for the failure of a servant to properly guard a dangerous agency with the duty of guarding which the servant has been entrusted when in consequence of such failure injury proximately results to another; but to say that the master, assuming that there has been no negligence in selecting and retaining the servant, is liable for the independent act of that servant in diverting the thing from the master's business and using it in his own or as an instrument of malice or amusement, is to lose sight of the principle underlying the whole subject. The distinction is thus illustrated in the

Shields case: "To better illustrate the ground of this distinction, we may, for example, suppose a servant, with others under his control, employed with a construction train repairing the track of his master. He may, for a time, quit his employment, and, with his men, go off on affairs of his own. Whilst thus out of the master's employment, he may build a fire which, through his negligence, may consume the property of another; and, in the meantime, loss of life and property may result from a collision with the train negligently left standing on the track. Now whilst, as has been held, the master would not be liable for the loss resulting from the fire, because the act was done outside the servant's employment (Morier v. Railway Company, 31 Minn., 351), yet it is equally certain that, for the loss occasioned by the servant's negligence in leaving the train on the track, the master would be liable in damages; for the plain reason that, in abandoning the custody of the train, he was guilty of negligence in the employment of the master, whilst, in building the fire, he was not." Pittsburg & C. Ry. v. Shields, 47 Ohio St., 394.)

In the case here stated the train and the engine drawing it would be eminently dangerous forces which may give rise to dangers in many different ways, and they are of such a character and so used that it is difficult for any employe connected with them to so completely divert them, or any of their more dangerous parts, such as their whistles, their steam, and the like, from the railroad operations as to entirely disconnect his personal use of them from his use as a servant. And it is the coexistence of representative and personal action that may sustain most of the decisions in cases where engines or parts of them have been used in malice or sport. (Nashville & C. Ry. v. Starnes, 9 Heisk, 52.) But in some instances the separation may be complete as in International & Great Northern Railway Co. v. Cooper. Another instance may be supposed by extending the illustration used in the Shields case. Among the dangers to which railroad engines give rise none is more familiar than that of communicating fire. It is therefore undoubtedly the duty of an engineer to carefully keep in the fire used by him to prevent damage. But add to the facts supposed in the illustration that he had taken fire from his firebox and, with it, had burned a building to gratify his malice, or had built a bonfire for his amusement, would there be any difficulty in declaring that the act was his alone and not that of the railroad company? Yet the hose containing the compressed air in this case was as easily and as completely turned from the service of the railroad company and used as exclusively for Nicholls' amusement as would be the fire in the instance supposed, or the hose and the water in the Cooper case.

The fallacy of the argument that, because a master is bound to use due care to guard dangerous things, he is responsible for any unforeseen and sudden misuse his carefully selected servant may make of them may be illustrated by reference to other duties quite as clear as that invoked. Masters are bound to use due care to furnish to their servants safe and suitable tools and places to work and may entrust that duty to a particular employe; and it would be quite as reasonable to say that an assault committed by that employe upon another, to whom the

duty was owed, with the tool or in the place furnished, would be a violation of that duty, as that the use made by Nicholls of the airhose was a breach of the duty to safely keep. The answer to both propositions is that such acts are to be regarded as those of the man who commits them because by thus departing from the service he loses his power to represent the master. If Nicholls' employer had been an individual and had done what Nicholls did he would have been liable, not because he failed to guard the compressed air, but because he did the act. Nicholls' act, in doing which he could not represent his employer, was no less his independent act. The failure of duty to guard the dangerous thing has nothing to do with the liability in either case.

The conclusion that it conclusively appears that the plaintiff in error is not responsible for Currie's death leads to the reversal of the judgments below and the entry of judgment in its favor.

*Reversed and rendered.*