# Staunton.

## Dalby, etc., v. Shannon & Florence.

### September 18, 1924.

1. Master and Servant—*Appeal and Error—Conflict in Evidence—Case at Bar.*—In the instant case, an action by a servant against his masters for the loss of an eye through the negligent shooting at a rat by a fellow clerk, one of the defendants testified that he told the clerk not to shoot rats in the prescription room, where the shooting occurred. But the testimony of the clerk was in conflict with the testimony of the plaintiff in this respect, therefore the jury were warranted in disbelieving the testimony of the defendant and as the verdict was for the plaintiff the Supreme Court of Appeals must disregard so much of the testimony of the defendant as stated that he had restricted the authority of the clerk as to the portion of the store in which he was authorized to shoot rats.

2. Master and Servant—*Action for Personal Injuries by Servant—Negligence of Fellow Servant—Evidence Sufficient to Support Verdict for Plaintiff.*—In an action by a servant against his master for the loss of an eye through carelessness of a fellow servant while attempting to shoot rats, the evidence showed that the fellow servant was authorized by his employers to shoot rats anywhere in the store provided he did the shooting in a careful, *i. e.,* in a nontortious manner.

   *Held:* That the evidence was sufficient to support a verdict of the jury in favor of the plaintiff.

3. Master and Servant—*Action for Personal Injuries—Carelessness of Fellow Servant.*—Where a clerk in a drug store was authorized by his employers to shoot rats anywhere in the store in a careful manner his employers are liable to a fellow servant of the clerk for compensatory damages for the result of shooting done by the clerk in a careless or tortious manner.

4. Master and Servant—*Liability of Master or Principal for a Tortious Act—Test of Liability—Case at Bar.*—Where there is neither express authority in advance nor ratification afterwards [which is the situation disclosed by the evidence in the instant case], the test of the liability of the master or principal for the tortious act of the servant or agent, is not whether the tortious act itself—the act in the manner in which it was done—is a transaction within the scope of the servant's or agent's authority; but the true test is whether, if the act had

been done in a nontortious manner, the service itself, in which the tortious act was done in the instant case, the service of rat shooting with the rifle, was within the scope of such authority.

5. MASTER AND SERVANT—*Agency—Action Against Master and Servant or Against Principal and Agent—Verdict Exonerating Servant Exonerates Master.*—Where a master and servant, or principal and agent, are joined as defendants in an action against them for damages for an injury occasioned by the negligent conduct of the servant, or agent, a verdict exonerating the servant, or agent, also exonerates the master or principal, and the latter cannot be held liable in such action.

6. MASTER AND SERVANT—*Verdict Exonerating Servant Exonerates Master—When Rule not Applicable.*—The rule that when master and servant are joined in an action for the negligence of the servant a verdict exonerating the servant exonerates the master does not apply where the servant did not appear or plead, and the case stood as to the servant upon a conditional judgment which had been entered at rules against him and upon a writ of inquiry which had been awarded against him and remains unexecuted.

Error to a judgment of the Circuit Court of the city of Norfolk, in an action of trespass on the case. Judgment for plaintiff. Defendants assign error.

*Reversed and final judgment entered.*

This is an action instituted by Dalby, an infant boy twelve years of age, by next friend, against Shannon & Florence, partners, who conducted a retail drug store business in the city of Norfolk under the firm name and style of Shannon & Florence, seeking to recover damages for an injury to the plaintiff, who was employed by Shannon & Florence to deliver packages from said drug stock; the injury and cause of it consisting of this: One of the eyes of the plaintiff was put out by a rifle shot wound occasioned by the negligent firing in the said store of a rifle by one M. K. Scott, who was in the employment of Shannon & Florence at the time. The circumstances attending the shooting are hereinafter detailed.

The said parties will be hereinafter referred to by name, or as plaintiff and defendants, in accordance with their positions in the trial court.

There were two counts in the declaration, one against said defendants and the other against them and the said Scott.

'The trial resulted in the following verdict:

"We, the jury, find for the plaintiff and assess damages against Shannon & Florence for ($5,000.00) five thousand dollars."

This verdict the trial court set aside on the ground, which is stated in the opinion of the court, which is a part of the record, as follows:

"In this case there is not in my opinion any evidence of original or primary negligence on the part of the defendants, Shannon & Florence; and they can only be held liable on the principle of agency. And as the testimony was that just before the accidental discharge of the rifle their agent had been shooting at a mark, and was, at the time of the discharge, waiting for a rat to come out from under the carbureter to shoot it, I think he was not acting within the scope of his agency. In saying this, I am not losing sight of the fact that one of the partners (Shannon) knew that the rifle had been on the premises and that his agent had used it to shoot a rat.

"It does not seem to me that the evidence is sufficient to sustain the verdict against the defendants, Shannon & Florence, and I will, therefore, set it aside and enter judgment for these defendants."

Shannon, one of the defendants, testified, in part, as follows:

"Q. You were present when Mr. Scott brought the rifle in the store that night, were you?

"A. Yes, sir.

"Q. You have told the jury you heard a shot and you knew he killed a rat because he said so?

"A.  I told the jury I didn't hear the shot, I didn't see the shot, but from what they said I was satisfied he killed a rat.

"Q. Did you see him shooting in that store at all?

"A. No, sir; I didn't.

"Q. What did you say to him when he brought the rifle in?

"A. I asked him what he was going to do with it.

"Q. What did he tell you?

"A. He said he was going to shoot a rat.  I said: 'Scott, don't attempt to shoot rats in this prescription room on this floor.'

"Q. Not to shoot rats in the prescription room on this floor?

"A. On account of the bullet might ricochet and maybe strike something and hurt somebody.

"Q. You told him that, and after that he shot the rat?

"A. He did go in the back room and shoot a rat?

"Q. You didn't discharge him then, did you?

"A. No, sir; because the occurrence passed out of my mind and I didn't think any more of it.

"Q. Did you tell him not to shoot any rats in the stock room?

"A. No, sir; I didn't tell him at that time.

"Q. You didn't object to his shooting rats in the stock room?

"A. Yes, sir; I would have objected to it but I never heard any more of it.

"Q. But you didn't object?

"A. Not at that particular time; no, sir."

Scott's testimony on the subject, on cross-examination was, in part, as follows:

"Q. He didn't object to your shooting the gun, did he?

"A. I don't know about that.

"Q. He didn't tell you about any objection he had to your shooting it?

"A. He said the rifle had better be used carefully."

The following is a portion of the cross-examination and re-examination of Shannon:

"Q. You had a great many rats in that place, didn't you?

"A. Yes, sir; we did.

"Q. You were anxious to get rid of them?

"A. Well, I used to set some rat poison and some traps.

"Q. You didn't get rid of them by that process?

"A. Got rid of some of them.

"Q. You didn't get rid of the majority of them?

"A. No, sir; we have some of them yet.

"Q. You were willing for him to get rid of them if he could?

"A. If he could. It didn't appeal to me any because I didn't think he could kill enough to do any good.

"Q. You were perfectly willing for him to do it?

"A. Yes, sir; but I—

Reexamination:

"By Mr. Wells:

"Q. Were you willing for him to shoot that rifle in the prescription room?

"A. No, sir.

"Q. Did you ever give him permission to do it?

"A. No, sir.

"Q. Did you ever know he had fired the rifle in the prescription room?

"A. I never did.

"Q. State the location of this stock room with reference to the prescription room?

"A. Take this part here, the prescription room; the stock room was a tin shed room off to the left of that.

"Q. Was there a door from that prescription room into the stock room?

"A. No; sir, it was a separate room put up for Mr. Barr when he was there.

"Q. Are the customers allowed to go back there?

"A. No, sir.

"Q. Did Mr. Scott have power to hire or discharge the boys?

"A. No, sir."

On the subject of Shannon's knowledge that the rifle was in the store, he testified as follows:

"Q. Now, Dr. Shannon, when was it you first saw or knew of this rifle being on the premises?

"A. The Saturday night previous.

"Q. Previous to the accident?

"A. Yes, sir.

"Q. How did you happen to find out about it then?

"A. He came in with it in his hands.

"Q. Who do you mean by he?

"A. Mr. Scott.

"Q. What did he do with it at that time?

"A. I don't know exactly what he did with it at that time, but when he came in with it, I asked him what he was going to do with it because I never heard of him shooting rats.

"Q. Up to that time, had you ever heard of any rifle being there before?

"A. I never had seen any.

"Q. Had you ever heard of any?

"A. No, sir.

"Q. What did Scott do with the rifle, to your knowledge?

"A. A little later on he went out to the shed room, which is off from the main building. While I wasn't in there I know he did kill a rat in that shed room; that is, he took me back there to show it to me. I didn't even see the rat, it was behind the box. I think he killed a rat; am sure he did, from what the other boys said.

"Q. When did you next see the rifle after that?

"A. I don't believe I saw it at all after that.

"Q. You didn't see it until after this accident?

"A. I don't think I saw it after the accident.

"Q. Did you know it was on the premises after Saturday night?

"A. No, sir; I did not. In fact, it had passed out of my mind entirely. I had had a great deal of trouble about that time and the occurrence of the Saturday night had never occurred to me at all after that because I had never seen any rifle and I did not think especially he was going to shoot at a target in the prescription room.

"By Mr. Wells:

"Q. Did you ever give him permission to keep a rifle on the premises?

"A. No, sir.

"Q. Did you ever give him permission to shoot a rifle on the premises?

"A. No, sir.

"Q. Did you know he intended to keep a rifle there?

"A. No, sir."

The material facts, as they expressly appear, or may, and in view of the verdict of the jury, must be inferred by the court, are as follows:

The testimony appearing in the record shows that at the time of the accident the plaintiff was sitting on the top of a desk in the prescription room, to the right of the clerk, Scott; that Scott, after some target shooting, which is immaterial, laid the rifle down to fill a prescription; that he saw a rat come out and run under a carbureter in the prescription room; that Scott picked up the rifle, turned his back to the prescription counter, holding the rifle with the muzzle down, near the floor, intending to shoot the rat when it came out; that while in this position, by the carelessness of the clerk, the rifle was discharged, the bullet struck the concrete floor, ricocheted and struck the plaintiff in the eye, necessitating its removal; that the store of the defendant, including the prescription room (in which the accident complained of occurred on a Tuesday night), was so infested with rats as to constitute a nuisance, of which the defendants wanted to be rid; that with the knowledge of one of the defendants the rifle was kept by the servant clerk, Scott, in the prescription room, for the purpose of shooting rats; that it was brought into the store for that purpose by the clerk on the Saturday night next preceding the accident in question; that the defendant wanted the servant clerk to rid the store of rats by shooting them "if he could," as expressly admitted by the defendant, Shannon, in his testimony; that after Shannon had actual knowledge that the clerk had the rifle there for said purpose (which Shannon in his testimony admitted was as early as on the Saturday night next preceding the accident), Shannon said to the clerk (being the only thing he said to him touching any restraint upon the authority of the clerk in the premises, according to the testimony of the clerk)— "the rifle had better be used carefully."

[1] Shannon, indeed, testified that he said to the clerk (and the only thing he said to the clerk), after Shannon knew the clerk was going to use the rifle in the store to shoot rats was—"Don't attempt to shoot rats in this prescription room on this floor  *  *  on account of the bullet might ricochet and maybe strike something or hurt somebody." But the testimony of the clerk was in conflict with that of Shannon with respect to the claim and statement on the part of Shannon that he told the clerk not to attempt to shoot rats in the prescription room. Therefore, under the settled rule on the subject, the jury were warranted in disbelieving this testimony of Shannon; and, in view of the verdict being for the plaintiff, we must, under such rule, disregard so much of such testimony of Shannon as stated that he had restricted the authority of the clerk as to the portion of the store in which he was authorized to shoot rats, and consider the case as if Shannon had not testified that he told the clerk "don't attempt to shoot rats in the prescription room," and as if the aforesaid testimony of the clerk were the only testimony before the jury on such subject. The result is that the evidence before the jury must be regarded as showing the fact to be that the clerk was authorized by his employers to shoot rats anywhere in the store, including the prescription room, provided he did the shooting in a careful, *i. e.*, in a nontortious manner.

Other facts touching the effect of the verdict will be stated in the opinion.

*S. M. Brandt* and *Moses Ehrenworth*, for the plaintiffs in error.

*E. R. F. Wells*, for the defendant in error.

SIMS, P., after making the foregoing statement, delivered the following opinion of the court:

There are but two questions presented for decision, one by the assignments of error, and the other in the brief and in oral argument for the defendants, Shannon & Florence, both of which will be disposed of in their order as stated below.

[2] 1. Was there sufficient evidence to support the verdict of the jury in favor of the plaintiff against the defendants, Shannon & Florence?

The question must be answered in the affirmative.

The material facts, which appear from the evidence (which after the verdict in favor of the plaintiff we must regard as all the evidence in the case), and by reasonable inference therefrom, are set forth in the statement preceding this opinion and need not be repeated here, further than to restate the conclusion of fact with which that statement ends, namely, that the evidence before the jury must be regarded as showing the fact to be that the clerk was authorized by his employers to shoot rats anywhere in the store, including the prescription room in which the accident occurred, provided he did the shooting in a careful—that is, in a nontortious—manner.

[3, 4] In that situation, it is settled, certainly in this jurisdiction, that the defendants are liable to the plaintiff for compensatory damages for the result of the shooting done by the servant clerk in a careless, or tortious, manner. *Myers* v. *Lewis*, 121 Va. 50, 92 S. E. 988, cited with approval in *Director Genl.* v. *Merrill*, 133 Va. 69, 77, 112 S. E. 628. As held in that case—as correctly stated in the head-note: "Where there is neither express authority in advance, nor ratification

afterwards" (which is the situation disclosed by the evidence in the instant case), "the test of the liability of the master, or principal, for the tortious act of the servant or agent, is not whether the tortious act itself— the act in the manner in which it was done—is a transaction * * * within the scope of the servant's or agent's authority; but the true test is whether, if the act had been done in a nontortious manner, the service itself, in which the tortious act was done"—(in the instant case, the service of rat shooting with the rifle)— "was * * within the scope of such authority. That is to say, the true test is, was the service, in which the tortious act was done, incident to the employment. The master or principal is liable for the *tortious manner* in which a transaction is conducted, or a service is performed, by a servant or agent, entrusted by the former to the latter to be conducted or performed for him in a nontortious manner."

A number of decisions in other jurisdictions are cited in behalf of the defendants, Shannon & Florence, upon the question under consideration, namely: *Chicago, etc., Co.* v. *Smith*, 10 Kan. App. 162, 63 Pac. 294; *Dolan* v. *Hubinger Co.*, 109 Iowa 408, 80 N. W. 514; *Stevens* v. *Woodward*, 6 Q. B. Div. 318; *Winkler* v. *Fisher*, 95 Wis. 355, 70 N. W. 477; *Turley* v. *Boston & Maine Railroad*, 70 N. H. 348, 47 Atl. 261; *Golden* v. *Newbrand*, 52 Iowa, 59, 2 N. W. 537, 33 Am. St. Rep. 257; *Smith* v. *Peach*, 200 Mass. 504, 86 N. E. 908; *Evers* v. *Krouse*, 70 N. J. L. 653, 58 Atl. 181, 66 L. R. A. 592; *Guille* v. *Campbell*, 200 Pa. 119, 49 Atl. 938, 55 L. R. A. 111, 86 Am. St. Rep. 705; *Galveston, etc., R. Co.* v. *Currie*, 100 Tex. 136, 96 S. W. 1073, 10 L. R. A. (N. S.) 367; *Doran* v. *Thomsen*, 79 N. J. L. 99, 74 Atl. 267, and *Holler* v. *Ross*, 68 N. J. L. 324, 52 Atl. 472, 59 L. R. A. 943, 96 Am. St. Rep.

546. Of these decisions it is sufficient to say that an examination of them discloses that they all recognize the correctness of the test applied in *Myers* v. *Lewis,* *supra* (121 Va. 50, 92 S. E. 988), and none of them is in conflict with that case in their holding touching the principle involved.

[5] 2. Is the rule recognized in a number of decisions referred to in the brief and in oral argument for the defendants (which is to the effect that where the master and servant, or principal and agent, are joined as defendants in an action against them for damages for an injury occasioned by the negligent conduct of the servant, or agent, a verdict exonerating the servant, or agent, also exonerates the master or principal, and the latter cannot be held liable in such action) applicable in the instant case?

The question must be answered in the negative.

[6] It appears from the record that a constitutional judgment was entered and confirmed at rules against all of the defendants, and a writ of inquiry of damages was awarded the plaintiff against all of the defendants. That on the trial there was no appearance of the defendant clerk, in person or by counsel. That the only defendants who appeared and pleaded on the trial were the defendant partners, the employers, or masters, of the defendant clerk. The orders in the case, and the verdict, must be read in the light of such facts. When so read it is manifest that the writ of inquiry was not attempted to be executed against the defendant clerk on the trial which was had. That the case was not before the jury as against the defendant clerk, but only upon the execution of the writ of inquiry as against the defendant partners. Therefore, upon and after the return of the verdict against the defendant partners, without mention therein of the defendant clerk, the case

still stood, as to the latter, upon the conditional judgment which had been entered at rules against the latter, and upon the writ of inquiry which had been awarded against him, that writ remaining still unexecuted.

It further appears from the record that after said verdict was returned, as aforesaid, and before the trial court acted upon the motion of the defendant partners to set aside the verdict against them, "the plaintiff moved the court to execute the writ of inquiry as to the defendant, M. K. Scott" (the said defendant clerk); and that the hearing upon that motion was continued. And it also appears from the record that that motion has not yet been acted upon by the trial court. What the trial court did was this and only this: It, on motion of the defendant partners, set aside the verdict against them and dismissed the case; thereby, in effect, refusing to execute the writ of inquiry as against the defendant clerk.

Such being the situation, it seems plain that the verdict cannot be properly construed as finding that the servant clerk was not guilty of negligence. Hence, the rule in question can have no application to the instant case.

For the reasons above indicated, we are of opinion that the trial court erred in setting aside the aforesaid verdict against the defendant partners and in dismissing the case without executing the writ of inquiry as against the defendant servant; and the case will be reversed and final judgment will, under the statute (Code section 6365), be rendered for the plaintiff against the defendants, Shannon & Florence, for five thousand dollars ($5,000.00), the amount of the verdict, with interest thereon from the 10th day of February, 1922 (the date of the verdict), until paid, and costs in the trial court

and in this court—as the facts were fully developed on the trial which has been had and are thus such before us as to enable us to attain the end of justice by rendering such final judgment.

*Reversed and final judgment entered.*

PRENTIS and BURKS, JJ., dissenting.