# Staunton.

## ROARING FORK RAILROAD COMPANY V. LEDFORD'S ADMINIS-
## TRATOR.

### September 17, 1919.

1. RAILROADS—*Injuries on or Near Track—Contributory Negligence
   —Case at Bar.*—Deceased at the time of the accident, which re-
   sulted in his death, was walking on the track of defendant rail-
   road parallel to a sawmill where he was employed. The opera-
   tion of the mill made so much noise that one near it would not
   be likely to hear the ringing of an engine bell. Employees of
   the mill were accustomed to use the track of the railway as a
   walkway, with the knowledge and acquiescence of the defendant
   railroad. Deceased approached the advancing engine which
   killed him walking very slowly and looking towards the side
   of the track and backward at a workman at work on a flat car
   on another track.

   *Held:* That deceased was guilty of gross negligence, which would
   bar recovery unless the doctrine of last clear chance was ap-
   plicable.

2. LAST CLEAR CHANCE—*Injury on or Near Track of Railroad—
   Licensees—Case at Bar*—However great the negligence of de-
   ceased, a licensee, killed by an engine of defendant on its rail-
   road track, might have been, defendant owed him, under the
   doctrine of the last clear chance, the duty, through its engine-
   man and fireman, to exercise ordinary care to avoid injuring
   him on the track after, by the exercise of ordinary care, they or
   either of them should have perceived his peril, and that he was
   obviously unconscious of it.

3. LAST CLEAR CHANCE—*Injury on or Near Track of Railroad—
   Licensees—Case at Bar.*—A railroad is bound to keep a rea-
   sonable lookout ahead of a moving engine to observe whether
   any person, who might be reasonably expected to be on the
   track in the locality in question, is thereon in a position or
   condition of obvious unconsciousness of his peril, in order that
   those in charge of the engine may then discharge the further
   duty, imposed by the doctrine of last clear chance, of doing all
   they can consistently with their higher duty to others to stop

13

the train so as to save the person upon the track from the consequences of his own action.

4.   Last Clear Chance—*Injury on Track—Duty of Railroad as to Lookout.*—The duty of enginemen to do all they can to save a licensee upon the track from the consequences of his own negligence arises not alone upon the actual discovery of his position or condition of unconsciousness of his peril, but also when by the exercise of ordinary care by the enginemen or firemen in keeping a reasonable lookout along the track, such position and condition would have been discovered in time to have avoided the accident.

5.   Last Clear Chance—*Injury on Track—Duty of Railroad as to Lookout—Case at Bar.*—The duty of looking along the track in front of a moving train or engine, extends, of course, and applies to a sufficient radius of distance ahead to enable the engineman to stop the train or engine by the exercise of reasonable care and diligence by the application of the brakes, or otherwise, should he observe a person on the track in a position and condition of unconsciousness of peril. It cannot be discharged by the engineman looking ahead a fourth of a mile and never looking again, but contenting himself with supposing that a person he saw on the track a fourth of a mile away would get off the track before the engine reached him.

6.   Last Clear Chance—*Engine on Track—Case at Bar.*—In the instant case it appeared from the evidence that the deceased was in a position and condition of unconsciousness of his peril on the track a sufficient radius of distance ahead of a moving train to have enabled the engineman to have stopped the train by the exercise of reasonable care, and such position and condition would have been apparent to the engineman had he discharged his duty of lookout.

*Held:* That under the doctrine of last clear chance defendant railroad was liable for the death of deceased, notwithstanding his contributory negligence.

Error to a judgment of the Circuit Court of Wise county in an action of trespass on the case. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

This is an action instituted in the trial court by the defendant in error against the plaintiff in error to recover damages for the death of the plaintiff's intestate alleged to

have been caused by the negligence of the railroad company in not keeping a reasonable lookout for the deceased, who was killed in the daytime upon the track of the railroad by a locomotive engine running backward, the tender being in front, striking the deceased and killing him instantly.

The parties will be hereinafter referred to as plaintiff and defendant in accordance with their positions in the court below.

The deceased was at the time of the accident employed at a large saw-mill, planing mill and lumber yard, not owned or operated by the defendant, but by a lumber company between whom and defendant no relationship existed except that of shipper and common carrier when occasion for the relationship arose (and such occasion did not arise in the instant case), in connection with which plant a band-saw-mill was operated, which was in operation at the time of the accident, and which made a great deal of noise, so much so, indeed, that one near it would not be likely to hear the ringing of the bell of an engine approaching on the railroad track in the locality where deceased was killed. The defendant's railroad track passes along the west side of the saw-mill shed, parallel with it and about twenty-five feet therefrom. The shed is about one hundred and twenty-five feet long. The band-mill is located under and near the south end of the shed. The railroad track at this place runs north and south and is straight for practically half a mile from the mill in both directions. Between the mill and the main-line railroad track is a switch or lumber track, which switches off from the main line at a point some fifteen feet to the north of a point on the main line opposite the band-mill and runs thence between the main line and the mill shed, and thence on, parallel with the main line, northward.

Immediately preceding the accident the deceased and one A. S. Estep, a fellow-workman for the lumber company and

one of the witnesses for plaintiff, were at work near the south end of the mill, unloading a car of hemlock, and they started together to go northward to get a car loaded with poplar which was standing several hundred yards away on the lumber track, their purpose being to run it down on the lumber track to the mill and unload it. They started on their errand, going out of the mill with the intention on the part of Estep to walk northward on the main-line track of the railroad, as he testifies. The deceased was behind Estep, "maybe two or three feet," as they left the mill shed. Estep came to the main line just at the switch of the lumber track aforesaid, and as he got on the main line at that point he "looked up the road" (to the northward) "and saw an engine coming down" (going southward and approaching the mill) "probably four hundred yards above, maybe a little further or maybe not quite so far;" and he "turned and walked up the switch" or lumber track. Estep did not look back after seeing the deceased two or three feet behind him as they left the mill shed, as aforesaid, until he (Estep) had gone a distance of about one hundred feet along the lumber track and had reached a point thereon about opposite the north end of the mill shed, by which time he testifies that the engine was coming down the main line nearly opposite to him and he looked around to see where the deceased was, and the latter was forty or fifty feet behind him (Estep) down on the main line walking towards the engine looking westward "(indicating), looking over that way like he saw something or something had his attention." Estep testifies that at this time the thought struck him "to run back in front of the engine and pull him to the other side. I started back—. He was sixty or seventy-five—fifty to seventy-five feet; I guess, away from the engine then. I was forty to fifty feet from him then on the other track. * * * I never measured it and cannot say exactly, but

can give a very good guess. I started back and stumbled and came very near falling and looked up and the engine was making pretty good speed, and I saw I could not make it down there and I let in to hollering at Ledford to get out of the way, as loud as I could holler, motioning at the engineer all the time to stop. The engineer was looking at me and he began to slow up a little bit about the time it struck him. * * * The engineer was looking down—it seemed like he was looking at me."

Estep exhibited a diagram made by himself which shows the location above mentioned, and other locations presently to be mentioned. Such diagram (with the location of the band-mill and flat car added thereto by us as per the location of them given in evidence but not shown on the diagram as used before the jury) is here copied.

Estep further testified that he lost sight of the deceased as the engine was going down upon him "four or five feet before the engine struck him." That deceased "still had his head turned" when Estep last saw him.

That the engineman stopped the engine in 'probably a hundred, or maybe two hundred, feet" after putting on the emergency brakes.

W. K. Minor, another witness for plaintiff, was at work on a standard-gauge flat car on a temporary track on the west side of said main line, a little to the north of the sand-house shown on said diagram. He was framing the flat car and was in a corner of the car nearest to the sand-house putting in a truss-rod. The position of the flat car and of this witness is shown on the diagram.

Minor heard Estep's call. Until then he had not heard the engine bell nor the engine approaching nor seen the deceased. On hearing Estep, Minor says that he raised up and saw the engine and the deceased, that the deceased "was

not standing, he was walking very slow," looking back towards the witness, going along about the middle of the main-line track, the engine being then "in eight or nine feet of him," and it struck him at a point on the track eighteen feet north of witness, the best the witness remembered, saying he "measured it once, and I believe it was eighteen feet."

This witness also testified in substance to the noise made by the mill in operation to the effect that when the mill is in operation a person near the mill would not likely hear an approaching engine if he was busy at work or had something else on his mind.

The only eye-witness of the accident was T. E. Mitchell, a witness for the defendant, an employee of the lumber company, who was at the location indicated on the diagram immediately preceding and at the time of the accident, with a hammer-head between his knees filing it, when, as he testifies: "I heard some one holler and looked up and Mr. Ledford looked like he was standing looking across the railroad, and when I looked to the engineer and looked back at Mr. Ledford again and he was trying to make his escape to get out of the way when I looked back at him; he first started * * * west, and he came back * * * east * * * toward the mill again when the engine struck him. * * * To the best of my knowledge, he was standing still when I first saw him." This witness, then testifying with reference to the diagram displayed before him and the jury, stated that the deceased was struck by the engine "something near fifty-four feet" from the planing mill, that witness measured this distance. That the deceased "started this way and changed and came back and got something near middle-ways of the track and the engine struck him." That there was a reason for deceased not going on across

and off the track on the west side of it, out of the way of the engine, which was this: there was a flat car standing there, which is above mentioned, that the deceased "could have got in the clear, but he probably thought he could not. * * * He started that way and then turned back across and the engine caught him."

This witness testifies that when he first looked up from his work filing the hammer-head, he thought that the deceased "had stopped there and was hollering across to Mr. Minor," but witness was not sure as to who did the "hollering" he heard.

The engineman, a witness for defendant, testified that his engine was three or four hundred yards north of the mill going south running backward, with the tender in front when he saw two men on the main-line track, who came from under the mill shed, as he supposed. That they were coming towards the witness. That they were some distance away and witness did not "pay much attention to them." That witness was in the engineman's place, which put him on the east side of the engine, as it was running backward, with the tender in front, as aforesaid. That after first seeing the men, as aforesaid, witness paid no more attention to them until he had gotten closer to them, and when there was still "plenty of time" for them to have "gotten off" the track, one of them (who proved to be Estep), who was then on the lumber track as witness then discovered, attracted the attention of the witness by hollering and throwing up his hands. That witness "knew by that that there was something going wrong" and witness at once put on the emergency brakes to stop the engine. That the deceased was then out of sight of witness and witness supposed that the deceased was off the track on the west side of it, hidden from the view of witness by

the tender of the engine. That witness' view of the track in the direction of the deceased was cut off by the tender for a distance of "something like two, or three or four full-rail lengths" because of witness' position on the side of the engine as it ran backwards. That is to say, the view of the witness of the main-line track as the engine approached the point of the accident was cut off for a distance in front of the tender as it moved of from sixty, or ninety or 120 feet, as testified by this witness. That witness, by applying the emergency brakes, stopped the engine in "maybe fifty yards, or something like that," he did not know the distance exactly. This witness also testified, in substance, that after first seeing the two men on the track he did not at any time thereafter see the deceased and "did not pay any attention to him," or look again along the track; and that when Estep attracted witness' attention, as aforesaid witness then "did not pay any attention" to deceased, but witness gave as the reason for this that deceased was out of the sight of witness "in plenty of time to have gotten off" the track.

This witness testified that the whistle was sometimes blown for the mill, but was not so blown on this occasion, as he was sitting down and would have had to rise up to blow it—that the bell was ringing and he did not think it necessary to blow the whistle; that the last whistle-blow was some 600 yards north of the mill. That the bell was ringing all the time after the engine came in sight of the mill, some 400 yards away, until the accident.

As to the bell-ringing, it is sufficient to say that the testimony of the witness for plaintiff is such that, even under the demurrer rule, we must take it to be a fact that the bell was rung as stated by the engineman.

14

The fireman testified as a witness in behalf of the defendant, and said that he was ringing the bell and did not see the deceased at all before he was killed. The fireman did not testify whether he did or did not look along the track while he was ringing the bell or that the bell-ringing prevented his doing so. He said that the engine was "running about twenty miles an hour, I guess," and that running at that rate of speed it could have been stopped in "about three rail-lengths, I expect—three or four" (90 or 120 feet).

The speed of the engine was not so great as to constitute negligence under the undisputed circumstances of the case, but it bears on the question of what distance the deceased was away from the engine at the moment when and shortly before he was first seen to be unconscious of his peril. The extreme speed of the engine, as given in some testimony for the plaintiff, was thirty miles an hour before the brakes were applied. Other testimony for plaintiff and defendant estimated it at fifteen to twenty miles an hour before such time.

No further mention of the evidence is deemed material except to say that it shows a prior long-accustomed use of the main-line track of the railway of the defendant at the locality in question as a walkway by employees of the lumber company, with the knowledge and acquiescence of the defendant.

There was a demurrer to the evidence by the defendant, which was overruled, and the judgment under review was entered in favor of the plaintiff upon the verdict of the jury.

The sole assignment of error involved the sufficiency of the evidence to support the action of the trial court in overruling the demurrer aforesaid.

*Irvine & Stuart,* for the plaintiff in error.

*J. C. Noel,* for the defendant in error.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

[1]   1. It is plain from the statement of facts preceding this opinion that this is a case in which the deceased was guilty of gross negligence, which would bar any recovery by the plaintiff unless the doctrine of the last clear chance is applicable.

2. On the question of whether such doctrine is or is not applicable to the case, we have the following to consider.

[2-4]   The deceased occupied toward the defendant the relationship of a licensee. It is well settled, therefore, that however great may have been the negligence of the deceased, the defendant owed to him, under the humane doctrine of the last clear chance, the duty, through its engineman and fireman, to exercise ordinary care to avoid injuring him on the track after, by the exercise of ordinary care, they or either of them should have perceived his peril and that he was obviously unconscious of it, if that is a circumstance in the case. That is to say, the defendant owed to the deceased the duty of keeping a reasonable lookout ahead of the moving engine to observe whether any person, such as deceased, who might be reasonably expected by defendant to be on the track in the locality in question was thereon in a position or condition of obvious unconsciousness of his peril, in order that those in charge of the engine might then discharge the further duty imposed by the doctrine under consideration of doing all that they could, consistently with their higher duty to others, to stop the train so as to

save the deceased from the consequence of his own action. For the last-named duty arises not alone upon the actual discovery of such position and condition of such a person, but also when by the exercise of ordinary care by the engineman or fireman in keeping a reasonable lookout along the track such position and condition would have been discovered in time to have avoided the accident. *So. Ry. Co.* v. *Bailey,* 110 Va. 833, 67 S. E. 365, 27 L. R. A. (N. S.) 379; *Kabler's Adm'r* v. *So. Ry. Co.,* 121 Va. 90, 92 S. E. 815, and other Virginia cases therein cited.

. This statement of the law is too well settled to admit of controversy, and it is not controverted by argument before us in the case.

[5] Such duty of lookout along the track in front of a moving train or engine extends, of course, and applies to a sufficient radius or distance ahead to enable the engineman to stop the train or engine by the exercise of reasonable care and diligence by the application of the brakes, or otherwise, should he observe such a person on the track in the position and condition aforesaid. It is manifest that it cannot be discharged by the engineman looking ahead a fourth of a mile away and his thereafter never looking again along the track in a given locality, and by the engineman contenting himself with supposing that any person whom he may have seen on the track a fourth of a mile away will get off the track before the engine reaches him; for if this were true, the last clear chance doctrine would be wholly abrogated in so far as it imposes the duty aforesaid in the keeping of a reasonable lookout.

The evidence for the plaintiff, and indeed the testimony of the engineman himself would have warranted the jury in finding that after seeing the deceased and Estep on the track a fourth of a mile away the engineman did not look

again along the track upon which the engine was running until after the deceased was struck and killed, but contented himself with supposing the deceased had gotten off the track before the engine reached him.

[6] 3. The crucial question in the case before us, therefore, is this: was the deceased in a position and condition of obvious unconsciousness of his peril, on the track as far ahead of the moving engine as the radius or distance aforesaid, which position and condition would have been apparent to the engineman had he discharged the duty of lookout aforesaid?

According to the testimony in the record, which is mentioned in the statement preceding this opinion, Estep is the only witness who saw the deceased when he was at a distance from the approaching engine of fifty to seventy-five feet, and this was the next time that the deceased was seen by any one after he was observed by the engineman about 400 yards or 1,200 feet away. There is no evidence in the record that, when the engineman saw the deceased 1,200 feet away, the attitude of the deceased was that of one unconscious of his peril. But the situation was different when the deceased was next seen by Estep. At this time the position and condition of the deceased was unquestionably one of obvious unconsciousness of peril. It so impressed Estep the moment he saw deceased, and it cannot be doubted it would have so impressed the engineman could the latter have seen and had he seen the deceased at that time. Moreover, by reference to the diagram above and the testimony above mentioned, it will be observed that the deceased was then on the railroad track walking towards the approaching engine, with his face turned away from the engine, looking intently and continuously back at Minor, who was at work putting a truss-rod in one corner of the flat car,

which was standing on the temporary track, alongside and a few feet to the west of the main-line railroad track. Allowing for some movement of the deceased between that time and the later time at which Minor first saw the deceased (when the engine was "in eight or nine feet of him" and he was about "eighteen feet" north of Minor), but considering the relative speed of the engine and the deceased more favorably to the defendant than the defendant is entitled to have it considered under the statutory rule on the subject, the deceased must, at the time Estep saw him in peril, have passed Minor at least sixteen or seventeen feet and must have been looking back over his shoulder at Minor at work. The relative positions of the engine, the deceased and Minor make it evident that no one could have perceived the deceased under those circumstances and not have seen that his position and condition was one of obvious unconsciousness of his peril. There was presented not merely a man on the track walking towards an approaching engine in broad daylight with no obstruction to his view, apparently (as he was indeed actually) in possession of all of his faculties, but the added circumstances of work going on behind him beside the track, of that work having obviously attracted his attention and of his looking backward entirely away from his line of vision of the approaching engine and of his looking thus intently and continuously, not intermittently, as he walked.

It is true that it seems most probable from the evidence that the view of the engineman of the deceased at the time just mentioned was obstructed by the tender of the engine, so that the engineman could not then have seen the deceased had he looked along the track. And it is also true that the engine was then too close to the deceased for it to have been possible for it to have been stopped in time to have avoided

the accident. But how long had this position and condition of the deceased previously existed? Did it exist when the engine was an ample distance away from the deceased for the engineman to have observed it, had he kept the lookout which the law requires, and for him thereafter to have applied the brakes and have stopped the engine before it reached the deceased, had reasonable expedition been exercised in the premises?

On the last-stated question the evidence is wholly circumstantial. The direct evidence, however, shows that the same cause, namely, the work on the flat car, which occasioned the attitude of the deceased, aforesaid, at the time he was seen by the eye-witness, Estep, had previously existed. And the further fact is shown by direct evidence that the deceased took as long to go about sixty feet or twenty yards as Estep did to go about 100 feet or thirty-three and one-third yards, and hence 'hat the deceased was delayed for a time, thus measured as he proceeded along the main-line track by some cause or causes. Even in a criminal case the evidence to establish a fact need exclude only every reasonable doubt arising from a consideration of the evidence. Every other *possible* hypothesis does not have to be excluded before a fact in issue can be taken as proved, but only such other hypotheses as are consistent with the evidence in the case. It is *possible,* of course, that some other cause may have contributed to the delay of the deceased, but the evidence in the case points only to one cause, namely, the deceased having become absorbed in observing the work on the flat car, aforesaid. And comparing the progress of the deceased with that of the train and of Estep, the direct evidence discloses what was the length of that delay, namely, only for about twenty-five, thirty-seven and one-half or fifty seconds, dependent upon whether the speed

of the engine in traversing the distance of about 1,100 feet to the point of the accident was thirty or twenty or fifteen miles an hour. In view of the evidence in the case, it is not reasonable to infer that any of that delay was occasioned while the deceased was south of the flat car, as he could have then looked directly at Minor at work while he walked without delaying his progress. It was not until the deceased passed the point on the track opposite where Minor was at work that the progress of deceased would have been retarded by his looking back at Minor. The deceased having walked to the point without delay, measuring his progress by that of Estep as shown by the evidence, the engine would then have been at least about 550 feet away from the deceased, whatever was the speed of the engine, since the engine would have traversed about half the distance (of about 1,200 feet) it was away when the deceased and Estep first got on the main-line track, less about fifty feet the distance the deceased had gone up to this time. That would have left the engine about twelve and one-half or eighteen and three-fourths, or twenty-five seconds of time, in which to traverse such 550 feet, less the part of it the deceased himself traveled before he was struck, dependent upon the speed of the engine being thirty or twenty or fifteen miles an hour. Now, at thirty miles an hour, the engine would have gone about 550 feet in twelve and one-half seconds, or the same distance in eighteen and three-fourths seconds at twenty miles an hour, or in twenty-five seconds at fifteen miles an hour. This calculation, when considered along with the physical facts and other circumstances shown in evidence, demonstrates that the jury might properly have found from the evidence that the engine was going about eighteen and three-fourths miles an hour before the brakes were applied, and that Estep's prog-

ress was at the rate of about one-sixth as fast or of about three miles per hour. From the foregoing facts the inference is irresistable that the deceased had passed Minor and was in the attitude aforesaid of looking back over his shoulder at Minor at work on the flat car when the engine was still about 550 feet away from him and when, according to the testimony of the fireman, the engine could have been stopped within ninety to 120 feet, and according to the testimony of the engineman, within 150 feet "or something like that;" and when, according to the testimony for plaintiff, by Estep, the engine was in fact stopped, after the brakes were applied, within "probably a hundred, maybe two hundred feet." This gave the engineman ample time under the circumstances, he having no other duties, as is shown by the evidence, which interfered therewith, for the observation of the position and condition of obvious unconsciousness of peril of the deceased 550 feet away, had he discharged the duty of lookout, aforesaid; and for the co-ordination of his mind with his muscles, and for the application of the emergency brakes (which is but an instantaneous operation of itself), in time to have stopped the engine before it reached the deceased. We are, therefore, of opinion that the last clear chance doctrine is applicable to the case and is controlling in favor of the action of the trial court in overruling the demurrer to evidence and in entering the judgment under review.

It is claimed for the defendant, however, that it is incredible and not reasonable to be believed that the deceased had continued for such a preceding time to walk in the position in which Estep saw him, as aforesaid. That the deceased must have looked in the direction in which he was walking at frequent intervals and so must have seen the approaching engine at the time or before he was within the radius

or distance away from the engine, aforesaid, or must have appeared to the engineman to have done so had the latter then kept a lookout along the track. Estep testifies that the deceased did in fact walk in that position without changing his attitude while Estep looked upon him just before the accident. Minor also testifies that he saw the deceased "walking very slowly" in that position, without changing his attitude just before the accident. If the jury had credited that testimony, which it was within their province to do, it is just as credible that the deceased had been walking for the next preceding period of time in question in practically the same attitude. The same cause therefor being in existence, as shown by the evidence, during such preceding time, there is nothing incredible or unreasonable in the inference that the same effect was produced thereby during such time. And whether one could thus walk would depend in great measure on the smoothness of the way. We cannot assume in the absence of evidence on the subject that the way between the ties of the track in the locality in question was not filled in with ballast of some kind. There is no such evidence in the case and the fact that the deceased did so walk for a time, as the direct evidence establishes, negatives the inference sought to be drawn by the defendant that it was impracticable for the deceased to have so walked for a preceding time.

It is contended for defendant that there is no evidence that the deceased had been looking away from the track until he reached the point where Estep saw him, within fifty or seventy-five feet of the engine. This position ignores the testimony of Minor that the deceased was looking at him at work, as aforesaid, and it ignores the location of the flat car and of the position on it of the work that Minor was doing, which attracted the attention of the deceased, and that the deceased must have passed the point opposite

Minor before the looking at the latter would have retarded the progress of the deceased, and it ignores the other circumstances established by the direct and circumstantial evidence in the case above adverted to.

The circumstance that the deceased became confused when he at length discovered the approach of the engine when it was within eight or nine feet of him, and that he then, in his fright, made the error of not springing from the track next to the flat car, cannot relieve the defendant from liability for its negligence, aforesaid, for two reasons: first, because the evidence does not show that if the deceased had continued his first movement to the west he would have escaped, and, secondly, because that conduct of the deceased was but a result reasonably to be expected of one in his perilous position at the time when the negligence of the defendant occurred, from the result of all of which he would have been saved by the discharge of its duty, aforesaid, by the defendant under the last clear chance doctrine.

It should be further observed that nothing which is said above leads to the conclusion, as is contended for defendant would be the result of such a holding, that a railroad company in the operation of its trains needs to slow down their lawful speed or that the operation of its trains will be in any manner delayed, except where the perilous position and condition of a licensee on the track exists and is or would be obvious to the engineman or fireman in the exercise of ordinary care in the performance of their duties, among which is the duty of keeping the reasonable lookout aforesaid. Then, as is said in *So. Ry. Co.* v. *Bailey, supra* (110 Va. 833, 67 S. E. 365, 27 L. R. A. (N. S.) 379), "it becomes the duty of those in charge of the train to do all they can consistent with their higher duty to others, to save him" (the licensee) "from the consequences of his own act," but not until then.

For the foregoing reasons, the judgment under review must be affirmed.

*Affirmed.*

## UPON PETITION FOR REHEARING.

SIMS, J.:

We are asked to reopen this case upon certain questions of fact, and certain portions of certain testimony is specifically called to our attention, and certain inferences of fact are sought to be drawn therefrom; but as none of such testimony was overlooked in reaching the conclusions announced in the original opinion, the situation merely being that there is direct evidence for the plaintiff in the record in conflict with such inferences, so that they could not be drawn by us on our consideration of the case upon the demurrer to the evidence which was interposed by the defendant, the prayer of the petition must be denied.

For example, upon the chief question of fact put in issue by the position of the petition, that "Minor was not south, but eighteen feet west of Ledford at the time of the accident and Ledford was then looking sideways and not backward over his shoulder," the following extracts are quoted in the petition from the testimony of Minor, a witness for the plaintiff:

"Q. Tell the jury how that occurred as you saw it?

"A. Well, I was framing a flat car, that is, standard-gauge car, and I was down in the corner of this car putting in a truss-rod. I had not heard any train or anything of the kind until I heard some one holler. When I raised up, the train was in something like eight or nine feet of Ledford, and he was going up meeting the train about the middle of the track, and it struck him.

"Q. How close were you to the track and to this train when it struck Ledford?

"A. 1 believe, the best I remember, it was eighteen feet; I measured it once, and I believe it was eighteen feet. * * *

"Q. Tell when you first observed, if at all, the engine slacking up or slowing up.

"A. I could not tell from where I was working there at the sand-house at the end of the car sitting on a temporary track by the side of the main line. When it struck Ledford it was only about eight feet until it knocked him out of my sight behind the sand-house."

Minor does here state, in substance, that he was eighteen feet from *the track and the train* when it struck Ledford; and also that when the train struck Ledford "it was only about eight feet until it knocked him out of my sight behind the sand-house." And if this testimony stood alone, the reasonable inference to be drawn therefrom would be that Minor testified that Ledford was struck by the train at a point on the track west of and at right angles from Minor. But this testimony does not stand alone. Minor was there testifying without the map or diagram made by Estep being before him, and his reference to the distance of "eight feet" that Ledford was knocked so as to pass out of his sight was but an estimate, and an estimate not in accord with other testimony in the case for the plaintiff. Subsequently, on cross examination (p. 21, record), there are the following questions and answers of Minor.:

"Q. Mr. Minor,. I wish you would step up to the jury and show them just where you were working, on this little map, please sir. This is supposed to be the main track and the engine was backing down this way, and this is supposed to be the spot where Mr. Ledford was struck; that is the sand-house, and this is the blacksmith shop. Where were you working?

"A. I was betwixt the shop and the sand-house building a car.

"Q. Eighteen feet from the point where he was hit?

"A. Yes."

Now, the map referred to in the testimony of Minor just quoted was the map or diagram made by Estep which was in evidence for the plaintiff, and is shown in the statement preceding the original opinion which we have handed down in this case. On that diagram itself the point was marked at which Ledford was when struck by the train, as testified to by Estep, by the very fact of his making the diagram and marking such point thereon and putting the map in evidence. On the same diagram itself was also marked the point at which Minor then was, as testified to by Estep by the very fact of his making the diagram and marking such point also thereon. These points, as marked on the map, furnished direct testimony for the plaintiff and an ocular demonstration that such direct testimony was that Ledford was some distance north of Minor at the time the train struck Ledford, and that the former was not then at right angles to the latter; and it is apparent from the respective positions of the two as shown on such diagram that Minor was south of Ledford at the time of the accident, and that Ledford, to have looked, as he walked, at Minor must have been looking, not merely sideways (at right angles), but backward. And in Minor's statement last quoted we have his direct testimony that he (Minor) was eighteen feet from the point where Ledford was hit, given while referring to the aforesaid map before him on which the point where Ledford was hit was marked, as aforesaid. Again, the position of Minor, as marked on said diagram, does not indicate that he was as far as eighteen feet away from a point on the main-line track to the west and at right angles to him. Considering such evidence on demurrer

thereto by the defendant, we could not escape the conclusion that Ledford was eighteen feet north of Minor at the time of the accident, and was then looking backward over his shoulder.

Of the other matters of fact discussed in the petition, we deem it sufficient to say that on a careful review of them we find that there is ample testimony for the plaintiff in the record to sustain the conclusions we have reached and expressed in the original opinion.

*Rehearing denied.*