# Wytheville.

BROADUS B. BARNES AND SAMUEL BALLENTINE V.
R. E. ASHWORTH, ADM'R OF MARTIN L. HAG-
WOOD, DECEASED.

June 12, 1930.

Absent, Hudgins, Gregory and Browning, JJ.

The opinion states the case.

*Harry H. Kanter*, for the plaintiffs in error.

*James G. Martin* and *Tom E. Gilman*, for the defendant in error.

EPES, J., delivered the opinion of the court.

This is an action brought by notice of motion for judgment in the Circuit Court for Norfolk county,

by R. E. Ashworth, administrator of Martin L. Hagwood, deceased, against Samuel Ballentine and Broadus B. Barnes to recover for the death of said Hagwood who was struck and killed about 10:00 p. m. on February 25, 1927, by an automobile belonging to Broadus B. Barnes which was at the time being operated by Samuel Ballentine. At the time Hagwood was struck Barnes was sitting on the front seat beside Ballentine.

The defendants below assign error. For convenience we shall refer to the parties as plaintiff and defendants as they appear in the lower court.

The only negligence alleged is the negligence of Ballentine, the driver; and the only theory upon which the plaintiff seeks to fix liability upon Barnes, the owner of the automobile, is that Ballentine was operating the automobile as the agent or servant of Barnes and is liable under the doctrine of *respondeat superior* for the tort of Ballentine.

The case was tried twice in the lower court. The first trial resulted in a verdict silent as to Ballentine, the driver, but finding for the plaintiff against Barnes, the owner, and fixing his damages at $10,000.00. This verdict the court set aside on the motion of both defendants. The second trial resulted in a verdict for $8,000.00 against Ballentine and Barnes jointly, upon which the court entered judgement against both defendants.

On the first trial the court, over the objection of the defendants that there was no evidence in the record showing that Ballentine was the agent or servant of Barnes, gave the following instruction drawn by the court itself:

"The court instructs the jury that if they believe from the evidence that Ballentine was the agent or representative of Barnes in driving the automobile for

Barnes in the place of a chauffeur, then the negligence of the driver in the management of the automobile is chargeable to Barnes."

The jury on the first trial returned the following verdict: "We, the jury, find for the plaintiff and fix the damages at $10,000.00 against B. B. Barnes, the sum to be paid to Mrs. Anna Ashworth Hagwood."

Whereupon, as the record states, "Broadus B. Barnes and Samuel Ballentine moved the court to set aside the said verdict of the jury and to enter final judgment on behalf of both defendants, on the following grounds:"

(1) Because the verdict was contrary to the law and evidence; (2) because the verdict of the jury exonerated Ballentine, the actual operator of the automobile, from negligence and, therefore, as a matter of law, exonerated Barnes, the owner of the automobile, because Barnes could be held liable, if at all, only under the doctrine of *respondeat superior*, and hence the judgment of the court should be entered in favor of both defendants; (3) because the court erred in giving the instructions which were objected to by the defendants. This motion of the defendants was resisted by the plaintiff. .

The court granted the motion of the defendants to set aside the verdict, but refused to enter judgment for the defendants; and instead ordered a new trial on all questions at issue in the case, overruling the motion of the plaintiff that the verdict of the jury be held conclusive as to the amount of damages and the new trial limited to the question of the liability of the defendants. •

In "Plaintiffs' Bill of Exception A" the court states the ground upon which it set aside said verdict, but refused to enter judgment for the defendants, and order a new trial, *i. e.*: "The court was of opinion that the jury regarded this instruction" (the instruction

above quoted) "as telling them that any negligence of Ballentine would be imputed to Barnes alone, and that Ballentine would not be liable in this tort case personally, but would be exempt from personal liability in a similar way as an agent is in a contract case where the contract was made for the principal by the agent."

On the second trial this instruction was modified by adding at the end thereof the words "as well as the driver," and given as so modified.

The first assignment of error is the refusal of the court to enter final judgment for both defendants upon the first trial. The ground of this assignment is that as the verdict is silent as to Ballentine it amounts in law to a verdict that Ballentine was not liable for the death of Hagwood, upon which verdict Ballentine was entitled to have judgment entered in his favor; and that, therefore, inasmuch as Barnes can be held liable, if at all, only upon the ground that Ballentine was his servant or agent for whose negligence, if any, he must answer under the doctrine of *respondeat superior*, and as Ballentine is exonerated from liability by the verdict of the jury, Barnes was, as a matter of law, entitled to have the verdict against him set aside and judgment entered in his favor.

The precise question here involved has not been decided heretofore by this court, but some of the principles involved are the same as those laid down in *Sawyer* v. *City of Norfolk*, 136 Va. 66, 116 S. E. 245, and the question is referred to in *Dalby* v. *Shannon and Florence*, 139 Va. 488, 124 S. E. 186.

Some courts have held, as is here contended by the appellants, that where the master and the servant are sued together for the same act of negligence and the master's liability rests solely upon the servant's conduct, a verdict of the jury which is silent as to the

servant but finds the master liable is in law a verdict for the servant; and that upon either such a verdict, or upon a verdict in terms finding in favor of the servant and against the master, the servant is entitled to have judgment entered in his favor, if there be evidence in the record to support it, and that the court should thereupon enter judgment for the servant; and that then the servant, having been exonerated of liability by the express finding of the verdict, or by finding necessarily implied from the verdict, the court should set aside the verdict against the master and enter judgment in the master's favor, dismissing the action as to him.

But, the best considered cases, and we think the weight of authority, sustain the view that where a master and his servant are sued together for the same act of negligence and the master's liability, if any, rests *solely* upon the servant's misfeasance or malfeasance, a verdict which in terms finds for the servant and against the master or is silent as to the servant and finds against the master, is either predicated upon a misapprehension of the law, or is so capricious and arbitrary, or, at least, so contradictory and doubtful, that no judgment predicated upon the verdict should be entered for or against the plaintiff as to either the master or the servant, but upon the motion of either the plaintiff or the defendant master the court should set aside the whole verdict, the expressed or implied finding for the servant as well as the finding against the master. *Doremus* v. *Root*, 23 Wash. 710, 63 Pac. 574, 54 L. R. A. 649; *Emmons* v. *Southern Pac. Co.*, 97 Or. 263, 191 Pac. 333; *Begin* v. *Liederbach Bus Co.*, 167 Minn. 84, 208 N. W. 546; *Southern Ry. Co.* v. *Harbin*, 135 Ga. 122, 68 S. E. 1103, 30 L. R. A. (N. S.) 404, 21 Ann. Cas. 1011; *Pangburn* v. *Buick Motor Co.*, 211 N. Y. 228, 105

N. E. 423; *Hein* v. *Sulzberger & Sons*, 175 App. Div. 465, 163 N. Y. Supp. 995; *Childress, Adm'r.* v. *Lake Erie & W. R. Co.*, 182 Ind. 260, 105 N. E. 467; *Sparks* v. *A. C. L. R. Co.*, 104 S. C. 266, 88 S. E. 739; *Walker* v. *St. Louis-San Francisco Ry. Co.*, 214 Ala. 492, 108 So. 388; *Hobbs* v. *Illinois Cent. R. Co.*, 171 Iowa 624, 152 N. W. 40, L. R. A. 1917E, 1023 and note.

■ ■ When such verdict is set aside, as a general rule, a new trial against both defendants should be awarded both upon the question of the amount of damages and the liability of the defendants. But in such a case when a demurrer to the evidence would have been sustainable as to the liability of the party who is alleged to have committed the act of negligence complained of, the court should enter final judgment for both defendants. Such a case is very closely analogous to the case of *Sawyer* v. *City of Norfolk & Puritan Restaurant*, 136 Va. 66, 116 S. E. 245, in which this court held that in an action brought against a licensee and his licensor for an act of negligence of the licensee, where the liability, if any, of the licensor is wholly derivative and depends solely upon the alleged specific negligence of the licensee, if a demurrer to the declaration be sustained as to the licensee, judgment should also be entered for the licensor. See also *Dalby* v. *Shannon*, 139 Va. 488, 124 S. E. 186. Likewise in such a case if a demurrer to the evidence would have been sustainable as to the liability of the master or principal upon the grounds that there is no evidence of the existence of the relationship of master and servant, or principal and agent, the court should enter final judgment for the alleged defendant master or principal.

■ ■ However, there is a sound discretion vested in the trial court as to when the ends of justice will be the better served by granting a new trial upon all questions

involved or by applying such exceptions to the general rule; and unless it be a very plain case the action of the trial court in granting a new trial against both defendants upon all questions involved should not be distrubed, and this is especially true where the instructions given by the court may have been confusing to the jury.

We are of opinion that the trial court, in here applying the general rule, did not err either in refusing to enter judgment for the defendants or in refusing to limit the new trial to the question of the liability of the defendants.

The facts of the case as they appear from the evidence introduced at the second trial are as follows:

On February 25, 1927, about 7:30 p. m. the deceased, Martin L. Hagwood, and a party of friends, among whom were the defendants, Ballentine and Barnes, started out for Portsmouth, Virginia, on a pleasure ride in two automobiles. One of them, a Rollins sedan, belonged to Hagwood. The other, a new master Buick coach, belonged to Barnes, who had acquired it only a few days before.

The night was a dark, cloudy night; and there was a storm with rain between 9:00 and 9:30 p. m.

When they started out, in the Hagwood car were Hagwood, Ballentine and Rodman; and in the Barnes car were Barnes, Carstens, Campbell, Oakham and Whitaker, Barnes driving.

For several hours they drove around Portsmouth and its vicinity, the two cars keeping "pretty near each other." While returning to Portsmouth on the Bowers' Hill road, both cars stopped near Bowers' Hill. Here Ballentine got into the Barnes car, and Carstens got into the Hagwood car. This was about 10:00 p. m.

·Hagwood drove off first going towards Portsmouth. Some ten minutes or more afterwards the Barnes car followed him.

The collision in which Hagwood was killed occurred a little after 10:00 p. m. on the Bowers' Hill road about two miles towards Portsmouth from the place at which the cars stopped. The Bowers' Hill road here is approximately twenty-five feet between the ditches, with a macadamized surface in the center about sixteen feet wide, and dirt shoulders on each side approximately four feet wide.

The plaintiff's witnesses who testify with reference to what took place on the Bowers' Hill road that night fall into three classifications: (1) Carstens, who had been in the car with Hagwood and who was standing in the road near him when he was killed; (2) Ballentine, one of the defendants, who was in the car which struck Hagwood, and was put on the stand by the plaintiff, though as an adverse witness, and Campbell, who was in the car with Ballentine and Barnes; and (3) Wilson, a State officer, who came up after the collision but not before the Hagwood car had been moved from the left-hand to the right-hand side of the road.

The defendants introduced the testimony of Rodman who had been in the car with Hagwood and was standing in the road near him·when he was struck, of the defendant, Barnes, who owned the automobile driven by Ballentine and who was sitting on the front seat by Ballentine, and of Oakman and Whitaker, who were on the rear seat of the car (Barnes, or Ballentine car) which struck Hagwood.

The negro who appears to have been present at· the time Hagwood was killed did not testify in this case.

The facts appearing from the testimony of Carstens,

the uncontradicted testimony of Rodman, not in con-
flict or inconsistent with the plaintiff's evidence, and
the testimony of Wilson are these:

About two to two and a half miles from Bowers' Hill
where the cars had stopped, there is a lane leading off
to the right as one goes towards Portsmouth. Just
before Hagwood reached this lane a negro driving a
Studebaker roadster, coming from the direction of
Portsmouth, turned into this lane and stopped his car,
and then backed out just as the Hagwood car was about
opposite the mouth of the lane. Hagwood tried to
avoid striking the negro's car by turning his car sharply
to the left, but could not do so, and the right front fen-
der of Hagwood's car struck the rear fender of the
negro's car.

Hagwood ran his car over to the left of the road and
stopped it; and he, Carstens and Rodman all "jumped
out of the car and commenced arguing with him (the
negro) about the fender." The evidence most favor-
able to the plaintiff is that Hagwood's car was left parked
with the left wheels on the dirt shoulder and right on
the macadam surface. Here it may be noted that the
uncontradicted testimony of Ballentine is that the tail
light of Hagwood's car was located in the center of
the rear of the car.

The negro stopped his car on the right-hand side
of the road, one of the witnesses says, "well over to
the right" of the road; another, "on the extreme right-
hand side of the road" and a little in advance of the
Hagwood car.

All the witnesses agree that there was nothing to
have prevented Hagwood from having driven his car
over and parked it on the right-hand side of the road,
instead of leaving it on the left. After they had gone
over the negro's car, Rodman told Hagwood that his car

was on the wrong side of the road and suggested to him that he move it; but Hagwood replied that there was "plenty of space," and said something about getting the negro's license number first. Though both Rodman and Carstens testify that sufficient time elapsed after this suggestion was made to Hagwood to move his car for him to have done so, the car was not moved.

At the time of the collision in which Hagwood was killed the positions of the several parties were as follows: Hagwood was standing in the road, facing towards Bowers' Hill, that is in the direction from which he had come and from which the car driven by Ballentine was approaching; and was leaning on the running board on the left-hand side of the negro's car. Carstens was standing in the rear of the negro's car leaning over getting his license number; and says Hagwood was standing "right opposite me on my left." The negro's car had no tail light on it; but had there been a tail light on it, Carstens was standing in such a position as to cut off any view thereof from the rear. Rodman was "standing back about six or seven feet from them."

Rodman saw the car approaching and stepped back and said, "Look out for the light." Just as the Barnes car, driven by Ballentine, cut around to the right from behind Hagwood's car, Hagwood, who was facing the oncoming car, "raised up and it hit him." The car driven by Ballentine struck Hagwood and killed him, struck the negro's car and knocked Castens over into the ditch on the side of the road; and after striking Hagwood went on about the length of the car beyond the negro's car before it came to a stop. One witness places the distance between the front of the negro's car and the rear of the Barnes car when it came to a stop at about eighteen feet.

The running board and fenders on the left-hand side of the negro's Studebaker roadster were damaged and the little support on the side of it which holds the top up was bent by the collision with the car Ballentine was driving. Hagwood's brains were spattered on the side of the negro's runabout towards the rear at a point "just about the center of the seat."

As shown by the evidence of Ballentine and other witnesses, the right front fender of the car driven by Ballentine struck the left rear side of the negro's car and then Ballentine's car sideswiped the negro's car. The impact of the cars bent both fenders and little strip beside the running board on the right-hand side of the car Ballentine was driving, the front fender being bent at the "corner," and broke a hole in the windshield.

Dr. Leake, introduced by the plaintiff, testifies that Hagwood's skull was fractured and his jaw broken, and that he had a cut on his left hip and "other injuries" which are not described.

We now turn to the facts which appear from the testimony of the group who were in the Barnes car. Their testimony as to the position in which the Hagwood car was parked on the road, where it differs from that of Carstens and Rodman, is less favorable to the plaintiff than that of Carstens and Rodman, and places the Hagwood car nearer the center of the road than do Carstens and Rodman.

Either as, or soon after, they left the point near Bowers' Hill at which both the Hagwood and the Barnes cars had stopped, Ballentine asked Barnes to let him drive the car, which was a new Buick, and "try it out." Barnes exchanged seats with Ballentine and let him drive the car. This was about two miles from the place of collision. After this change Ballentine was

at the wheel, with Barnes sitting by him to his right on the front seat, and Whitaker, Campbell and Oakham on the rear seat.

When they were some distance from where Hagwood's car was parked (Ballentine estimates the distance at one-half mile, Barnes from 300 to 400 yards), both Ballentine and Barnes, at practically the same time, saw the red tail light on Hagwood's car. Both of them testify that there was no light visible on the negro's car and that neither of them saw the negro's car until just before their car struck it.

At this time Ballentine was driving at from thirty-five to forty miles an hour. When Barnes saw the light he said to Ballentine: "Look out, there is a red light ahead," and told him to slow down. Whereupon Ballentine brought his speed down to about twenty miles per hour and continued on at that speed until the time of the collision. There is no material conflict in the testimony as to the speed of the car. All the other witnesses place the speed of the car just before the collision at from eighteen to twenty-five miles, and witness Campbell, introduced by the plaintiff, says: "He was making about twenty miles, twenty to twenty-five miles at the most."

The road here is described as a "crowned road" and Ballentine was driving in the center of the road until he was a short distance from the Hagwood car. The uncontradicted testimony of Barnes is that this was the custom of persons using that road. The headlights and brakes of the car were in good condition, and the lights burning.

Omitting that part of their testimony with reference to the position in which Hagwood's car was parked, which conflicts with other evidence of the plaintiff which is more favorable to him, the testimony of Bal-

lentine who was put on the stand by the plaintiff, and of Barnes who was put on the stand by the defendants, with reference to what took place from the time they first saw the red tail light of Hagwood's car, stated as far as practicable in their own language, is as follows:

Ballentine testified: When I was about half a mile away, "I noticed a tail light on Mr. Hagwood's car." The tail light on Hagwood's car "was in the center of the car." I saw no other light, and did not see the negro's car "until the collision took place." I could not see or tell that the Hagwood car was not properly placed in the road "until I was nearly on the car." "When I drove up to the back of it I thought I would be able to pass on the left side," and pulled over to the left side of the road to do so. This "threw my lights across the road over towards the ditch" on the left hand side, and I saw "nothing at all" of the negro's car. When I got within about twenty feet of Hagwood's car I saw that "I had to either turn in the ditch or turn to the right, and I turned to the right." When I ascertained that I could not get around to the left of the Hagwood car, and turned to the right to pass to the right of it, I was, "I guess, about twenty feet" from it and going, "I guess, about eighteen or twenty miles an hour, not over twenty." "I didn't see it (the negro's car) until after it happened." "When I turned out" (to the right), "I guess possibly (I) run a little ways before I ever saw this car" (the negro's). I did not see the negro's car "until I was on it." "I shoved the brakes on," and skidded into the negro's car. "I turned to the right and was so close to the other car (the negro's) I could not stop, and in the meantime I struck Mr. Hagwood." After I put on the brakes I went "about the length of the car." "That includes the skidding and the stopping of the car from the time

I shoved the brakes on." I went about the length of my car beyond the negro's car before I stopped. "The back of my car was about even with the front of his." "When I turned out" (to the right) "it was so close I could not stop in time to keep from hitting Mr. Hagwood." "I did not know I had hit him until after I got out and went back to see." My car passed between the Hagwood car and the negro's car. "I didn't hit Mr. Hagwood's car at all" but I struck the negro's car and "it bent the corner of the (my) right front fender and broke a hole in the windshield."

Ballentine's testimony is further to the effect that he did not see Carstens or Rodman standing in the road; and that he was accustomed to driving a car.

Barnes testified: "I noticed a light probably three or four hundred yards ahead of me, and I called his (Ballentine's) attention to it, and when I did Mr. Ballentine slowed down." "Mr. Ballentine was driving to the center of the road." "It was a crowned road." "As he approached the car I think he wanted to pass to the left of the car, and as he drove up practically behind the car" he turned to the left "and he sees that he don't have room there, and he turned his car around in that manner" (to the right), "and when he gets abreast of this car" (the Hagwood car) "he notices the other car." "We had not seen it before he gets between these, and to keep from running in the back, both fenders collided together and he went over here I guess fifteen or twenty feet and stops the car." "I didn't see any light at all" on the negro's car. When the car I was in "cut its lights around the end of the Hagwood car," the distance to the negro's car was "barely the length of the car, because he barely had room to get between the two. He was nearly abreast of it before he saw it at all." Just prior to the accident

Ballentine had "slowed down to practically eighteen or twenty miles" an hour.

"Ballentine did not hit the Hagwood car. The collision of the Barnes car with the negro's car bent both fenders and a little strip beside the running board." As far as I know the brakes were properly adjusted, but I had had the car only two days and had not had them tested. They were four-wheel brakes and under ordinary conditions will stop a car going eighteen to twenty miles an hour in twelve feet; but I would not say that on a dark night following a storm and in a sudden emergency I could do so. I would not say what I could do. It would not be a fair test.

The testimony of the witnesses Whitaker, Campbell and Oakham corroborate the above testimony of Ballentine and Barnes, and present no additional material facts. None of them testify to having seen the negro's car or any light thereon, or any persons standing in the road before the collision.

After the collision Barnes, who had theretofore driven Hagwood's car a "little bit" in an effort, he says, to get Hagwood's car moved to the left of the road before it caused another accident, jumped in Hagwood's car, stepped on the starter and turned the engine over two or three times; but the car did not start and he jumped out and got some of those there to help him push it over to the left side of the road. Barnes says that he was in a hurry and in the midst of excitement, and is not sure that he turned the switch on before starting the car. The appellant seeks to show by his testimony that there was some mechanical defect in the starter on Hagwood's car which prevented him from starting the car after he had stopped it and from moving it over to the right side of the road where it should have been parked. There is no other evidence in the record to

show or even remotely tending to show that this is a fact; and this is insufficient evidence from which an inference may be fairly drawn that it was a fact.

This is all the material evidence bearing upon the question whether or not Ballentine is liable for the death of Hagwood.

The second assignment of error relates to the action of the court in giving, as amended, by the addition of the words "as well as the driver," the instruction heretofore quoted relating to the liability of Barnes if the jury should find that he was the master or principal of Ballentine. In the view which we take of this case it is fruitless to discuss this assignment of error.

The third assignment of error is that the court erred in giving on the second trial, at the request of the plaintiff, instruction No. 7 below quoted. The ground of error assigned is that "there is no evidence in the record to sustain a 'last clear chance' instruction as is the one herein set fourth," to-wit, Instruction No. 7 which reads:

"The court instructs the jury that even though they may believe from the evidence that the plaintiff's intestate was guilty of contributory negligence in that he parked his car on the left side of the road, yet, if they further believe from the evidence that Ballentine knew of the plaintiff's danger, or by the exercise of ordinary care should have known of the plaintiff's danger in time to have avoided the accident by the exercise of ordinary care, it was his duty to do so, and if they further believe from the evidence that Ballentine failed to exercise his duty your verdict should be for the plaintiff."

Though, so far as the evidence pertinent to the application of the rule of the last clear chance is concerned, there is no material difference between the evidence

at the first and second trials, the court on the first trial gave no instruction predicated upon the last clear chance.

■■ "The test to be applied in determining whether there is sufficient evidence to furnish the basis for an instruction is, would a verdict in accordance with the instruction be set aside for lack of evidence to support it? If not, then the instruction may be properly given." Burks, J., in *Shiflett's Adm'x.* v. *Va. R. & P. Co.*, 136 Va. 72, at page 78, 116 S. E. 500, 502. Therefore, the question presented here is assuming that Hagwood was guilty of contributory negligence, is the evidence sufficient to sustain a verdict predicated upon the doctrine of the last clear chance? The doctrine or rule of the last clear chance presupposes that there has been negligence on the part of both the plaintiff and the defendant. Unless there is evidence that the plaintiff has been guilty of contributory negligence it has no application to the case under consideration.

There is evidence in the case at bar not only that the plaintiff was guilty of negligence which contributed as a factor to his injury and death, but that such negligence continued to the moment that he was struck and killed; and it therefore becomes pertinent to inquire, when is the rule of the last clear chance applicable when the negligence of the plaintiff continues to the time of the injury and is a factor contributing thereto?

We shall herein refer to the person for the injury to whom, or for the death of whom, recovery is sought as the plaintiff, whether he be the plaintiff or the person for whose death the plaintiff sues.

■ In many jurisdictions the rule of the last clear chance is held to have no application unless the defendant had actual knowledge of the peril of the plaintiff.

Under the subject "Negligence," it is said in 20 Rul-

ing Case Law, pages 141-143, citing cases from a number of States in support thereof: "The basis of recovery in this case as in others is the defendant's superior knowledge of the peril. It has been said that the ground upon which a plaintiff may recover, notwithstanding his own negligence, is that the defendant, after becoming aware of the danger to which the plaintiff was exposed, failed to use a proper degree of care to avoid injuring him. * * * The defendant's knowledge, however, must have been actual knowledge; he is not to be held liable upon proof that he ought to have discovered the plaintiff's perilous situation, for such proof does not establish superior knowlege of the peril. It is what the defendant did or failed to do after acquiring knowlege of the plaintiff's peril that constitutes the breach of duty. * * * Very often the proposition has been stated that there can be no recovery when it appears that the negligence of the plaintiff continued until the very moment of the injury, by which is understood to mean that both parties neglected to use their senses to discover the dangerous situation.

"If both plaintiff and defendant failed to look, a recovery is barred upon the plainest principles, but there are cases holding the contrary. So, in some jurisdictions it is held that if the engineer or motorman, by the exericise of reasonable diligence, could have learned that danger was imminent, but did not do so, the liability of the company will be determined in all respects as though he had in fact become aware of it, the constructive knowledge being deemed apparently the equivalent of actual knowledge.* * * Such decisions, however, virtually abolish the doctrine of contributory negligence." 20 R. C. L. page 143, section 116.

However, in Virginia, and in some other States, the doctrine of the last clear chance has been extended

much further and the rule is applied (1) to that class of cases in which the peril of the plaintiff was actually known to the defendant or ought to have been known to him from facts and circumstances brought home to his knowledge, and (2) to that class of cases in which the defendant owes to the plaintiff a duty to keep a reasonably careful lookout, commensurate with the nature of the agency he is using or operating and the nature of the locality, and by the exercise of ordinary care ought to have seen or known of the plaintiff's perilous situation in time to have avoided the injury by the exercise of ordinary care. *Southern Ry. Co.* v. *Baily*, 110 Va. 833, 67 S. E. 365, 27 L. R. A. (N. S.) 379; *C. & O. Ry. Co.* v. *Corbin*, 110 Va. 700, 67 S. E. 179; *Gunter* v. *Southern Ry. Co.*, 126 Va. 565, 101 S. E. 885; *Roaring Fork R. Co.* v. *Ledford's Adm'r*, 126 Va. 97, 101 S. E. 141, 871.

So also, in Virginia the application of the doctrine of the last clear chance in the second class of cases has been extended much further than in some of the other States which recognized its applicability to the second class of cases. See *Mosso* v. *E. H. Stanton Co.*, 75 Wash. 220, 134 Pac. 941, L. R. A. 1916-A 943, a well considered case in which it is held that in the second class of cases the doctrine of the last clear chance has no application unless the negligence of the plaintiff has either terminated or culminated in a situation of peril from which the exercise of ordinary care on his part would not thereafter extricate him. See also, *Moy Quon* v. *M. Furuya Co.*, 81 Wash. 526, 143 Pac. 99; *Fennel* v. *Yellow Cab Co.*, 138 Wash. 198, 244 Pac. 253. As will be seen, the Virginia cases go further than this.

Some confusion has resulted from the language used in the different cases on this subject, but upon a review of the Virginia cases on the subject, we apprehend that

the rule to be deduced from the decisions of this court with reference to the applicability of the doctrine of the last clear chance to cases in which the negligence of the person injured continues up to the time of the injury and is a factor contributing thereto or a condition thereof, is this:

In the first class of cases (those in which the defendant saw or had actual knowledge of the peril of the plaintiff) when the negligence of the plaintiff continues up to the time for the injury, the rule of the last clear chance is only applicable *when and after* the defendant is aware, or ought to be aware from facts and circumstances brought home to his knowledge, that the plaintiff is unconscious of his peril and will take no steps to secure his own safety, or is in a situation from which the exercise of ordinary care on his part will not thereafter extricate him. *Southern Ry. Co. v. Bailey*, 110 Va. 833, 67 S. E. 365, 27 L. R. A. (N. S.) 379; *Southern Ry. Co. v. Baptist*, 114 Va. 723, 77 S. E. 477; *Norfolk, So. R. Co. v. Crocker*, 117 Va. 327, 84 S. E. 681; *Va. Ry. & P. Co. v. Wellons*, 133 Va. 350, 112 S. E. 843.

In the second class of cases (those in which the defendant does not see or have actual knowledge of the peril of the plaintiff, but owes to him the duty of lookout), the defendant as a matter of law is charged with the actual knowledge of what he must have seen and known had he performed his duty and kept such a lookout as he is required by law to keep. Hence, in the second class of cases the rule of the last clear chance has no application where the negligence of the person injured continued up to the time of the injury *unless and until* it is established that had the defendant kept such a lookout, as he was required by law to keep, he would or ought to have been aware, from facts and circumstances which would have been brought home to

his knowledge, that the plaintiff was unconscious of his peril and would take no steps to secure his own safety, or was in a situation from which the exercise of ordinary care on his part would not thereafter extricate him. *C. & O. Ry. Co. v. Corbin,* 110 Va. 700, 67 S. E. 179, 181, a case, however, in which the court says that "the jury would have been warranted in drawing the inference from the evidence that the engineer had *actual* knowledge of Corbin's peril;" *C. & O. Ry. Co.* v. *Shipp,* 111 Va. 377, 69 S. E. 925; *Kabler's Adm'r* v. *Southern Ry. Co.,* 121 Va. 90, 92 S. E. 815; *Roaring Fork R. Co.* v. *Ledford's Adm'r,* 126 Va. 97, 101 S. E. 141, 871; *Gunter* v. *Southern Ry. Co.,* 126 Va. 565, 101 S. E. 885; *Burr* v. *Va. Ry. & P. Co.,* 151 Va. 934, 145 S. E. 833.

When the defendant is aware, or ought to be aware from facts and circumstances brought home to his knowledge, that the plaintiff is unconscious of his peril, or is in a situation of peril from which he cannot by the exercise of ordinary care on his part thereafter extricate himself, or when in the second class of cases such state of facts would have been known to him had he been performing the duty of lookout imposed upon him by law, *then, and not until then,* does the rule of the last clear chance become applicable and the new duty of the defendant to use the last clear chance, if such there be, to avoid the injury arise. But when, under the rule above stated, the rule of the last clear chance has become applicable, it then applies even though the negligence of the plaintiff continues up to the instant of the injury.

In contemplation of law where circumstances have arisen which make the doctrine of the last clear chance applicable the failure to use a last clear chance, if it exists, to avoid the injury, is a new act of negligence

intervening between the negligence of the plaintiff and the injury; and becomes the proximate cause of the injury, and the negligence of the plaintiff, though it continue up to the time of the injury, is the remote cause."

The pertinent question is not, did the negligence of the plaintiff continue up to the time of the injury; but does the evidence show a state of facts under which the rule of the last clear chance becomes applicable under the above stated rule. If so, the continuance of the negligence of the plaintiff is immaterial.

The rule as above stated is as far as the Virginia decisions have extended the applicability of the doctrine of the last clear chance when the negligence of the person injured continues up to the time of the injury; and is as far as it can be extended without in such cases, in effect, abolishing the defense of contributory negligence and adopting in its stead the doctrine of comparative negligence.

There is language in some of the cases which apparently supports a broader application of the rule of the last clear chance; as, for instance, when it is said in *Burr* v. *Va. Ry. & P. Co.*, 151 Va. 934, 145 S. E. 833, 838: "It is well settled, under the doctrine of last clear chance, that when the defendant could have avoided the injury by the exercise of ordinary care, and failed to do so, he is responsible, although the plaintiff may have been negligent in exposing himself to peril, and although his negligence may have continued until the accident happened." Such statements, however, are too broad and are misleading unless they be understood to be strictly limited in their application to cases in which it has first been shown that under the rule above stated the rule of the last clear chance has become applicable.

■ In cases in which (assuming that the defendant has been negligent) the plaintiff has also been guilty of negligence which continued to the time of the injury and contributed as a factor thereto, but it is sought, nevertheless, to recover for the injury under the doctrine of the last clear chance, there are three questions, which arise in the order below stated, all of which must be answered in the affirmative before a recovery may be had:

(1) Does the evidence show a state of facts which, under the rule above stated, make the rule of the last clear chance applicable?

(2) If so, does the evidence show a state of facts existing after the rule of the last clear chance has become applicable, which presented an opportunity for the defendant by the exercise of reasonable care to avoid the injury?

(3) If so, does the evidence show that after the opportunity arose the defendant, under all the facts and circumstances of the emergency presented to him, failed to use ordinary care to avoid the injury?

If the preponderance of the evidence fails to give an affirmative answer to any one of these inquiries, then contributory negligence on the part of the plaintiff, continuing to the time of his injury, will bar his recovery.

■ In *Rooney* v. *Levinson*, 95 Conn. 466, 111 Atl. 794, 795, the court, following the well considered opinion of Prentice, C. J., in *Fine* v. *Connecticut Co.*, 92 Conn. 626, 103 Atl. 901, says:

"If, under the evidence presented, this case was a proper one in which to present the 'last clear chance doctrine' to the jury, the court should not have assumed that the expressions 'last clear chance' and 'intervening case' have such a well-defined meaning in common knowledge that a jury can comprehend and apply them

to the evidence presented in a case. The court should apply such terms to the situation presented by the evidence, by informing the jury, in substance, that negligence on the plaintiff's part which brings him into a place of peril will only be obviated by the negligence of the defendant where the jury finds: (1) That the injured party has already come into a position of peril; (2) that the injuring party then or thereafter becomes, or in the exercise of ordinary prudence ought to have become, aware not only of that fact but also that the party in peril either reasonably cannot escape from it or apparently will not avail himself of opportunities open to him for doing so; (3) that the injuring party subsequently has the opportunity, by the exercise of reasonable care, to save the other from harm; and (4) that he fails to exercise such care. * * * This instruction is erroneous in that it fails to present the four conditions the existence of which was essential to make the application of the last clear chance doctrine allowable.''

 When the plaintiff, being guilty of negligence, relies upon the doctrine of the last clear chance to sustain a recovery, the burden is upon him to prove by a preponderance of the testimony a state of facts which, under the rule above stated, made the rule of the last clear chance applicable, that then or thereafter an opportunity existed for the defendant by the exercise of ordinary care to avoid the injury, and that the defendant failed to exercise such care. *Washington, etc., Ry. Co.* v. *Thompson*, 136 Va. 597, 118 S. E. 76. Each of these facts must be proved like any other fact upon which the plaintiff relies; and as specifically and definitely as a plaintiff is required to prove any other act of negligence upon which he relies to support a recovery. This burden is not shifted because of the fact that the

trial court, or this court, in the phase of the case then under consideration must consider it as on a demurrer to the evidence.

In a case such as this, if the preponderance of the evidence, viewed as upon a demurrer to the evidence, fails to show affirmatively that there was (not might have been) the lapse of sufficient time after the rule of the last clear chance became applicable to afford an opportunity for the defendant, in the exercise of ordinary care under all the circumstances of the case, to have avoided the injury, the evidence fails to show a clear chance to avoid the injury, and is insufficient to support a recovery.

Or if the preponderance of the evidence, so viewed, fails to show affirmatively, with sufficient definiteness to enable one to put his finger on or to pick out and specify reasonably definitely, some act, which, after the doctrine of the last clear chance became applicable, the defendant did or did not do, which, in exercise of reasonable care viewed from the standpoint of one standing in the then shoes of the defendant, he could and ought to have done or omitted to do, which if done or omitted would have avoided the injury, it is insufficient to sustain a verdict predicated upon the doctrine of the last clear chance.

As said by Prentis, C. J., in *Washington, etc., Ry. v. Thompson*, 136 Va. 597, at page 603, 118 S. E. 76, 78: "It should and must be emphasized that a plaintiff is not entitled to recover under this doctrine upon a mere peradventure. He has no right to hold the defendant liable merely upon a showing that perhaps, if the defendant's agents had responded properly, promptly, instantaneously, he might have been saved. The burden is upon him to show affirmatively by a preponderance of the evidence which con-

vinces the average mind that by the use of ordinary care, after the peril was discovered, there was in fact a clear chance to save him. It is insufficient to show that there was a mere possibility of so doing.''

In applying the rule of the last clear chance it must always be borne in mind that the rule calls for the exercise of ordinary care under all the facts and circumstances of the case as they appeared to a person standing at the time in the shoes of the defendant, and not for extraordinary care and the use of all possible precautions.

Applying these rules of law and judging the instant case by these standards, the evidence, we think, is insufficient to support a verdict predicated upon the doctrine of the last clear chance.

The doctrine of the last clear chance did not become applicable until the defendant made the discovery that he could not pass to the left of Hagwood's car, and turned to the right to pass around and to the right of it.

At that time the car was traveling at from eighteen to twenty-five miles an hour, placing the distance from where Ballentine discovered that he could not pass to the left of Hagwood's car to where Hagwood was standing in the road at the maximum distance which the evidence will support, and Ballentine's speed at the minimum the evidence will support, the car driven by Ballentine required only one and one half seconds to traverse the distance from where Ballentine was when he discovered that he could not pass to the left of Hagwood's car to where he struck Hagwood.

The last clear chance implies thought, appreciation, mental direction, and the lapse of sufficient time to effectively act upon the impulse to save another from injury. When it is borne in mind that Ballentine was himself in an emergency which had been created by

Hagwood's negligence, we think that it cannot be fairly inferred from the facts proven that a sufficient time did elapse after Ballentine discovered that he could not pass to the right of Hagwood's car for him in the exercise of ordinary care to have avoided striking him. The most that can be said is that peradventure there may have been a possibility of his so doing.

But in addition to this. The evidence enables you to specify nothing which Ballentine, who, by an emergency created by Hagwood, was almost simultaneously confronted with the double necessity of acting for the safety of those in his car and then for the safety of Hagwood, could or ought to have done after he discovered that he could not pass to the left of Hagwood's car.

It is suggested that he *might* have turned his steering wheel a little more to the left and have thus avoided the car, but it is to be remembered that there stood Hagwood's car to his left, placed there through Hagwood's negligence, which had also to be avoided, and the evidence fails to show that had he turned further to the left he could have avoided Hagwood's car. It is also suggested that because of the fact that under ideal conditions the brakes on this car would stop it when going eighteen to twenty miles an hour within twelve feet, that the inference may be drawn that Ballentine was negligent in not having applied his brakes sooner than he did. But thought, appreciation, and mental direction must have preceded the application of the brakes, Ballentine was acting in a double emergency, and the road was wet, there having been a storm with rain about half an hour before, and the evidence is uncontradicted that Ballentine did apply his brakes as soon as he saw Hagwood or the negro's car.

Here again the most that the evidence shows is that peradventure Ballentine, by the exercise of extraordinary care possibly *might* have done something which would have avoided injuring this man, who by his own negligence, had placed himself in peril, and created the double emergency under which Ballentine was required to act.

The evidence was insufficient to support a verdict predicated upon the doctrine of the last clear chance, and the instruction should not have been given. In addition to this the language of the instruction is so broad that under the facts of this case it may readily have led the jury into a misconception of the law of the case. An astute lawyer might be able to reason from the language 'of this instruction that the law is that the plaintiff could not recover unless the evidence showed that the defendant was aware, or in the exercise of ordinary care ought to have become aware, that Hagwood was unconscious of his peril and apparently would take no steps for his own safety, or was in a situation from which the exercise of ordinary care on his part would not thereafter extricate him; but it is demanding too much to expect the laymen on the jury to know this from the language of this instruction.

The giving of said instruction is error for which the judgment of the court must be reversed and the verdict of the jury set aside.

We come now to a consideration of what judgment should be entered by this court upon the reversal of the judgment of the lower court.

We think that the evidence clearly shows that Hagwood was himself guilty of negligence which continued up to the time he was struck and killed, and was a factor contributing to his injury and death, which bars the recovery of the plaintiff in this case.

In contravention of the statute (Acts 1928, page 1022, chapter 399, section 2145 (26), 1928 Supp. Code Va.) prohibiting the parking of cars on the left-hand side of a road or street, and without any excuse for so doing, Hagwood, on a dark, rainy night, knowing not only that others might be traveling the road but that the car in which were Ballentine and his other friends was following him, parked his car on the left-hand side of the road, almost opposite the negro's car parked on the right hand side of the road, and at a distance therefrom which left little more than enough room between the cars for another car to pass. And he left it there, notwithstanding the warning of his friend, Rodman, that his car was on the wrong side of the road and should be moved, and notwithstanding the fact that he knew, or ought to have known, that in view of said statutory requirement and the long standing custom of the road which accords therewith, that a car parked on a dark night on the left hand side of the road has a tendency to deceive, or at least confuse, the driver of a car approaching the parked car as to where the right-hand side of the road lies.

Knowing the position in which these cars were parked and that the passage-way between them was narrow and little, if any, more than sufficient for another car to pass through without striking one or the other of the parked cars, and that the other car was following him, he went and stood in the road near the rear of the negro's car, and leaning on the left-hand running board thereof, further narrowed the clear space between these cars. In so doing he placed himself in an obviously dangerous position in which it was his duty for his own safety and that of others to keep a vigilant lookout for approaching cars and to use ordinary care to avoid being struck by a car attempting to go through the

narrow passage-way for the creation of which he himself was responsible.

This duty the evidence clearly shows that he failed to perform and was continuing to fail to perform until after being warned by Rodman just as the car driven by Ballentine cut around to the right from the rear of the Hagwood car, Hagwood "raised up and it hit him."

Hagwood was facing in the direction from which Ballentine's car was approaching with its headlights burning, and the conclusion is irresistible that Hagwood was either engrossed in his controversy with the negro over the collision which had just occurred and was not keeping a lookout for approaching cars, or that, though he saw this car approaching he took no steps to protect himself in the perilous situation which he himself had created and to guard against injury from such action as might be taken by the driver of the oncoming car acting in a double emergency for the creation of which he (Hagwood) was responsible.

"No one can be allowed to shut his eyes to danger in the blind reliance upon the unaided care of another without assuming the consequences of the omission of such care." *Va. & S. W. Ry. Co.* v. *Skinner*, 119 Va. 843, 89 S. E. 887.

As the contributory negligence of Hagwood bars recovery against Ballentine, there can, of course, be no recovery against Barnes.

The case will be reversed and judgment here entered for both defendants.

*Reversed.*