# Richmond

MARY BERNICE DICK V. VIRGINIA ELECTRIC AND POWER
COMPANY, A CORPORATION.

March 24, 1932.

Present, Campbell, C. J., and Epes, Hudgins, Browning and Chinn, JJ.

The opinion states the case.

*Russell T. Bradford* and *Alfred Anderson,* for the plaintiff in error.

*Williams, Loyall & Taylor* and *T. Justin Moore,* for the defendant in error.

BROWNING, J., delivered the opinion of the court.

Mary Bernice Dick was the plaintiff in the trial court and the Virginia Electric and Power Company, a corporation, was the defendant, and they will hereafter be referred to in this relation.

The defendant owns and operates a double track electric railway line from and partly through the city of Norfolk, Virginia, to the Naval Operating Base, a distance of about seven miles. This line runs for some distance over Hampton boulevard. The defendant's right of way is separated from the automobile roads on either side, in the vicinity of the place of the accident, by a ditch. The right of way, which is owned by the defendant, is rough and can only be crossed at certain fixed crossings. The plaintiff was injured at what

is known as "North Shore Crossing," sometimes referred to in the evidence as "Lochaven Crossing." There are certain stops along defendant's line which it makes to let off and take on passengers. From the "North Shore Crossing," where the accident happened, to Meadowbrook stop, the nearest stop to the south, from which direction the defendant's car was proceeding north, is a distance of 561 feet and from the center of the same crossing south to the Country Club crossing is 886 feet. The pertinency of these points and distances will be seen presently.

The plaintiff lived on the east side of Hampton boulevard about half a block from the crossing at which she was hurt. On December 1, 1929, at 6:30 or 6:40 P. M., when it was dark, she left her home to attend a night nursing case. Before leaving she had some trouble in getting her automobile started. It was cold and it required about ten minutes to get the engine going and then she "raced" the motor a minute or so before she started. She went north about half a block to the North Shore Crossing where she intended to cross defendant's tracks and then proceed south to the place of her employment. Before attempting to cross, plaintiff looked north and south and saw the defendant's car, between the Country Club and Meadowbrook apartment going north. As she drove on the track she slowed down on account of an automobile going south on the west side of Hampton boulevard, and then her car stalled because it was cold. She sat in her automobile alternately trying to get it started and watching the oncoming car until it struck her automobile and the injuries, of which she complained, were inflicted.

It is twice stated in plaintiff's brief that the impact knocked or turned the automobile over, and threw her from it. We find no evidence to sustain this. The evidence is quite to the contrary. The plaintiff's automobile was carried or knocked about ten feet in front of the street car and

was found standing across the tracks headed west, the direction in which the plaintiff was traveling at the time of the accident. The severity of the shock and injuries sustained by the plaintiff are not questioned. She instituted suit in the Circuit Court of the city of Norfolk and the jury rendered a verdict in her favor against the defendant for $2,500.00. On motion of the defendant the trial court set aside the verdict and entered judgment for the defendant by its order of July 14, 1930. A writ of error and supersedeas was awarded by this court.

The plaintiff's single assignment of error is to the said action of the court, and her contention is that the holding of the court took away from the jury the question of contributory negligence on her part, and also relieved the motorman of any duty to her. It was urged that the plaintiff may have been guilty of failing to exercise proper judgment in what she did, but that this did not excuse the motorman from looking out in approaching a public and much used crossing and to stop if necessary to avoid injury, and that certainly it did not justify his running into the automobile which he saw, or by the exercise of ordinary care could have seen, 686 feet ahead of him.

The plaintiff's case was based on the theory of the last clear chance.

The Special Court of Appeals, in the case of *Virginia Ry., etc., Co.* v. *Leland*, 143 Va. 920, at page 925, 129 S. E. 700, 701, quoted from other Virginia cases as follows: " 'The foundation of the doctrine is that the parties are guilty of concurring negligence, and there must be some condition, circumstance, or superadded fact which one of the parties saw, or by the exercise of ordinary care could have seen, that made it his duty to endeavor to avoid injury to the other negligent party, and the obligation of discovering the last clear chance is mutual.' *Green* v. *Ruffin*, 141 Va. 628, 125 S. E. 747 [127 S. E. 486]; *McNamara* v. *Rainey Luggage Corp., et al.*, 139 Va. 197, 123 S. E. 515.

" 'One relying on the doctrine of the last clear chance has the burden of proving affirmatively by a preponderance of evidence that by the use of ordinary care, after his peril was discovered, there was in fact a last clear chance to save him.' *Washington & O. D. Railway* v. *Thompson,* 136 Va. 597, 118 S. E. 79; *Hendry* v. *Virginia Ry. & Power Co.,* 130 Va. 283, 107 S. E. 716; *Ashby* v. *Virginia Ry. & Power Co.,* 138 Va. 310, 122 S. E. 104."

In the well reasoned case of *Barnes* v. *Ashworth,* 154 Va. 218, at pages 244, 245 and 247, 153 S. E. 711, 718, this court, speaking through Justice Epes, says: "In the second class of cases (those in which the defendant does not see or have actual knowledge of the peril of the plaintiff, but owes to him the duty of lookout), the defendant as a matter of law is charged with the actual knowledge of what he must have seen and known had he performed his duty and kept such a lookout as he is required by law to keep. Hence, in the second class of cases the rule of the last clear chance has no application where the negligence of the person injured continued up to the time of the injury *unless and until* it is established that had the defendant kept such a lookout, as he was required by law to keep, he would or ought to have been aware, from the facts and circumstances which would have been brought home to his knowledge, that the plaintiff was unconscious of his peril and would take no steps to secure his own safety, or was in a situation from which the exercise of ordinary care on his part would not thereafter extricate him. * * *

"When the defendant is aware, or ought to be aware from facts and circumstances brought home to his knowledge, that the plaintiff is unconscious of his peril, or is in a situation of peril from which he cannot by the exercise of ordinary care on his part thereafter extricate himself, or when in the second class of cases such state of facts would have been known to him had he been performing the duty

of lookout imposed upon him by law, *then, and not until then*, does the rule of the last clear chance become applicable and the new duty of the defendant to use the last clear chance, if such there be, to avoid the injury arise. * * *

"In cases in which (assuming that the defendant has been negligent) the plaintiff has also been guilty of negligence which continued to the time of the injury and contributed as a factor thereto, but it is sought, nevertheless, to recover for the injury under the doctrine of the last clear chance, there are three questions, which arise in the order below stated, all of which must be answered in the affirmative before a recovery may be had:

"(1) Does the evidence show a state of facts which, under the rule above stated, make the rule of the last clear chance applicable?

"(2) If so, does the evidence show a state of facts existing after the rule of the last clear chance has become applicable, which presented an opportunity for the defendant by the exercise of reasonable care to avoid the injury?

"(3) If so, does the evidence show that after the opportunity arose the defendant, under all the facts and circumstances of the emergency presented to him, failed to use ordinary care to avoid the injury?

"If the preponderance of the evidence fails to give an affirmative answer to any one of these inquiries, then contributory negligence on the part of the plaintiff, continuing to the time of his injury, will bar his recovery."

The motorman testified as follows:

"Q. * * * In what direction were you going at the time this accident took place?

"A. Going north.

"Q. And prior, or just prior, 'till the time that you saw this automobile, at what speed were you traveling?

"A. Between twenty and twenty-five miles an hour, to the best of my judgment.

"Q. Now when you first saw the automobile, whereabouts were you in reference to this crossing? How far were you from it?

"A. About 175 feet.

"Q. At that time did you have any intimation of danger or not?

"A. No, sir.

"Q. Why didn't you?

"A. I seen the automobile and I thought it was going to move on, and I didn't have any idea it was stalled there at the time.

"Q. Where were you when you first came to the conclusion that it was stalled and wasn't going to move?

"A. About 125 feet I reckon.

"Q. What, if anything, did you do at that time?

"A. Threw the car in emergency—cut the current off and threw it in emergency and done all I could before I hit the automobile."

The plaintiff was asked the following questions to which she gave the following answers:

"Q. When your car stalled, what did you do?

"A. I looked to see where the street car was.

"Q. Where was it then?

"A. It had made that stop after my car stalled, the Meadowbrook stop, in front of the Meadowbrook apartment.

"Q. Then what did you do?

"A. I tried to start my automobile by choking it and stepping on the starter and begun blowing my horn.

* * * * * * * * * * *

"Q. Is there anything to obstruct the view of a motorman, operating a street car, from the Meadowbrook apartment to the crossing where this accident happened?

"A. There is nothing it is perfectly straight.

* * * * * * * * * * *

"Q. After you stalled you stood there and watched it from the time it came from the Meadowbrook apartment?

"A. Yes.

"Q. Then did you see it start up again?

"A. Yes; I was not sitting there staring at it but was trying to start my automobile.

"Q. Did you more or less keep an eye on that street car as it came along, or did you pay no more attention to it?

"A. I was watching it all along; I expected it to drive up to me and stop.

*   *   *   *   *   *   *   *   *   *   *

"Q. * * * It wouldn't have been but a question of a second or a few seconds for you to have gotten out of that automobile, would it?·

"A. No. If I had thought that he didn't have any brakes, or that there was no motorman on there to see me sitting there, I had plenty of time to have gotten out.

*   *   *   *   *   *   *   *   *   *   *

"Q. And you saw at that time it was not decreasing its speed, didn't you?

"A. Yes, but I realized a street car could stop in a very small space.

"Q. And, at that time, when it was as much as 100 feet away you would have had ample opportunity, if you had wished, to have gotten out?

"A. Yes, but I still thought he would stop. He had plenty of time to stop.

*   *   *   *   *   *   *   *   *   *   *

"Q. And during all that time you were relying entirely on the fact that the motorman would see you and prevent the accident?

"A. There was no reason why he should not see me.

"Q. That is a correct statement, isn't it, Mrs. Dick.

"A. Yes.

*   *   *   *   *   *   *   *   *   *   *

"Q. Then you did, at that time, realize that there was some danger, did you not?

"A. No.

"Q. Then why did you blow your horn?

"A. Because I wanted to attract his attention if he had not seen me.

"Q. And you realized then that he might not be looking and might not see you, and you did it to warn him?

"A. I thought it highly possible that he would not see me, * * *."

If it be conceded that the motorman was negligent, in failing to keep a proper lookout and exercising reasonable care to discover the presence of the plaintiff on the crossing, and that he should have known her perilous situation in time to avoid the accident, still the plaintiff saw the oncoming car for over 561 feet, she saw it within 100 feet of her, when she admits that she had time to get out and save herself. She sat in the very presence of imminent danger without taking thought for her own safety, except her reliance upon the motorman to drive up to her and stop, and this in spite of her statement that she thought it highly possible that he would not see her. And there was reason for this statement. It was a dark night and the lights from the plaintiff's car shone to the west rather than towards the motorman. It is worthy of remark here that the plaintiff introduced a witness, Milton Baker, who drove for some distance alongside of the street car going along the highway in the same direction. When the motorman stopped at Meadowbrook stop he did likewise and then they started and proceeded together until Baker dropped back to let the car go ahead. Baker was examined in part as follows:

"Q. It was not until the car had started up and you had started up that you noticed it?

"A. Yes, sir.

"Q. And how far away were you when you noticed it?

"A. I was about half way from the stop to the crossing. I think that is about 200 feet."

It will be remembered that the motorman said that when he saw it he was about 175 feet from the crossing and that he was about 125 feet from it when he realized that the automobile was stalled. He testified further that his car was one of the large type and it required from 150 to 160 feet in which to stop it. We are unable to reach any other conclusion than that the plaintiff's own lack of care for herself, in other words, her own negligence, continuing to the very time of the accident, contributed to her injury.

Mr. Justice Epes said, speaking for the court, in the case of *Barnes* v. *Ashworth, supra,* and quoting from the case of *Virginia & S. W. Ry. Co.* v. *Skinner,* 119 Va. 843, 89 S. E. 887: "No one can be allowed to shut his eyes to danger in the blind reliance upon the unaided care of another without assuming the consequences of the omission of such care."

The cases of *Chesapeake & O. Ry. Co.* v. *Kidd,* 116 Va. 823, 83 S. E. 933; *Southern Ry. Co.* v. *Bailey,* 110 Va. 833, 843, 67 S. E. 365, 27 L. R. A. (N. S.) 379, are in point.

In the case of *O'Neill* v. *Middlesex & B. St. Ry. Co.,* 244 Mass. 510, 138 N. E. 841, the plaintiff's automobile stalled on car track. The plaintiff and his brother tried to push the automobile off the track. The plaintiff saw the car when it was about 200 yards away and his brother ran up the track and tried to stop it, but failed to do so. The plaintiff was struck by the car and injured. The court, in denying recovery (244 Mass. 510, 138 N. E. 841, at page 842), says: "We are unable to draw any inference from the evidence, except that the plaintiff's lack of care contributed to his injury. Apparently he relied entirely on the motorman to bring the electric car to a stop before it reached the automobile. But the night was dark, and the auto was where the motorman would not expect a vehicle to be. And although the plaintiff saw the car when it was 200

yards away, and heard it approaching with undiminished speed, he needlessly remained in a place where he was sure to be hit, when a step or two would have placed him beyond danger of injury. Without considering the other defenses, the ordering of a verdict for the defendant was justified on this ground."

This is not a case of the last clear chance. The evidence shows that the plaintiff was guilty of negligence continuing to the time of her injury and contributing thereto.

We affirm the action of the trial court in setting aside the verdict of the jury.

*Affirmed.*